SCHAUER, J.
 

 Defendant was charged with and convicted of a violation of section 4 of Ordinance No. C-1389 of the city of Long Beach. Such ordinance by its terms relates exclusively to the barbering business and provides in material part as follows:
 

 
 *Supp. 773
 
 “See. 4. Prices of services shall not be advertised in any publication, handbill or notice whatsoever. Price lists may be displayed in any barber shop but shall be so displayed as not to be visible from outside the shop. No advertising of prices shall be allowed on windows or on the outside of buildings or on the street or sidewalk. ’ ’
 

 “Sec. 6. Any person violating any of the provisions of this ordinance shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not to exceed Five Hundred Dollars ($500.00) or by imprisonment in the City Jail of the City of Long Beach for a period of not exceeding six (6) months, or by both such fine and imprisonment. ’ ’
 

 It was stipulated that “the defendant did on March 5, 1936, advertise prices of services rendered in the barber shop at 231 Bast First Street, in the City of Long Beach upon the outside of said building and plainly visible from the outside of said building or place of business”. There was no other evidence. The defendant was found guilty and from the judgment imposing a fine of $100 or fifty days in jail he prosecutes this appeal.
 

 It thus does not appear whether the defendant was himself a barber advertising his own services, perchance by chalk-writing on the wall of the barber shop building, or a sign painter who had painted outside the price list of services inside, but this is immaterial to the considerations before us. Indeed, the ordinance by its terms would equally place the stamp of criminal guilt upon the barber or the sign painter, or even a newspaper publisher who might in some column of tonsorial topics nefariously publish the price list of the barber of Bast First Street.
 

 It is sought to uphold the ordinance as an exercise of the police power. Such power is conferred on municipal corporations in California by section 11 of article XI of the Constitution, providing that “Any county, city, town or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws,” and within recognized constitutional limits, so far as they have not been exclusively occupied by state ordained regulations, municipalities may legislate as sover
 
 *Supp. 774
 
 eign bodies in any respect not inconsistent with state laws on the same subject.
 

 Chapter 814 of the Statutes of 1935 appears to be relied upon by respondent as a source of power to pass and enforce the ordinance here in question. Such statute declares the “existence of a State and National emergency productive of widespread unemployment and disorganization of trade and industry which burdens commerce and affects the public welfare of the people of this state”. It further declares that such emergency exists in certain “service trades,” including barbering, and purports to authorize the “governing body of a city, city and county, or county”, by ordinance, to enact as law the terms of a “code of fair competition” upon application of the “owners, operators or managers of not less than eighty per cent of the business establishments in such service trade” in the political subdivision. But the legislative act cannot operate to enlarge in municipalities a power which by direct constitutional grant they already possess coextensively with the legislature itself. Except that municipal legislation must be local and that it is subject to general laws, the regulatory power granted to municipalities by the constitutional provision above quoted is as broad as that of the legislature.
 
 (In re Maas,
 
 (1933) 219 Cal. 422, 425 [27 Pac. (2d) 373];
 
 People
 
 v.
 
 Levy,
 
 (1935) 8 Cal. App. (2d) (Supp.) 763, 767 [50 Pac. (2d) 509].) Since the municipal body by the direct constitutional grant already has power equal to that of the legislature, within the limits mentioned, such a statute can have no other effect on municipal power than that of limitation, and even that only by virtue of some inconsistent regulation therein contained.
 
 (Ex parte Daniels,
 
 (1920) 183 Cal. 636, 642 [192 Pac. 442, 21 A. L. R. 1172].)
 

 Neither chapter 814 of the Statutes of 1935, nor any other state law of which we are aware, purports to regulate the matters covered by the ordinance in question and we are, therefore, not confronted with any such problem of conflict of laws. But the test of the classic fourteenth amendment to our federal Constitution—“ ... no state shall make or enforce any law which shall abridge the privileges or immunities of citizens . . . nor shall any state deny to any person within- its jurisdiction the equal protection of the laws”— remains to be applied.
 

 
 *Supp. 775
 
 From the context it appears that the “services”, prices of which are forbidden to be advertised by anyone, are exclusively the services of barbers. Concerning a somewhat similar singling out of barbers in a holiday closing law the Supreme Court in the case of
 
 In re Jentzsch,
 
 (1896) 112 Cal. 468, 473 [44 Pac. 803, 32 L. R. A. 664], said: “A man’s constitutional liberty means more than his personal freedom. It means, with many other rights, his right freely to labor, and to own the fruits of his toil. It is a curious law for the protection of labor which punishes the laborer for working. . . . The laboring barber, engaged in a most respectable, useful, and cleanly pursuit, is singled out from the thousands of his fellows in other employments, and told that, willy nilly, he shall not work upon holidays and Sundays after twelve o’clock, noon. His wishes, tastes, or necessities are not consulted. If he labors, he is a criminal. Such protection to labor carried a little further would send him from the jail to the poorhouse.
 

 “How comes it that the legislative eye was so keen to discern the needs of the oppressed barber, and yet was blind to his toiling brethren in other vocations
 
 Í
 
 Steam-car and street-car operatives labor through long and weary Sunday hours, so do mill and factory hands. There is no Sunday period of rest and no protection for the overworked employees of our daily papers. Do these not need rest and protection ? The bare suggestion of these considerations shows the injustice and inequality of this law.” This case is followed and much of the above language is quoted in
 
 In re Boehme,
 
 (1936) 12 Cal. App. (2d) 424 [55 Pac. (2d) 559].
 

 It may be suggested that there is a substantial divergence of the facts in the case at bar from those related in the opinion above quoted from, in that in our case the ordinance recites that its regulations were enacted pursuant to “the application of an excess of eighty per cent, of the business establishments engaged in the barber trade in the City of Long Beach” and that chapter 814 of the Statutes of 1935 purports to authorize the enactment of similar or other regulations for certain other trades or industries, to wit: “beauty shop, cleaning and dyeing, rug cleaning and hat renovating”.
 

 It seems obvious that the mere request—even the unanimous request—of those persons engaged in a certain calling for special legislation applicable to that calling cannot in
 
 *Supp. 776
 
 itself change the constitutional character of that legislation nor can the mere addition of a limited number of other vocations in a regulatory sanction which is inherently arbitrary as to the several as well as the one, make natural that which is discriminatory. So far as the vocation of barbering is concerned, we may concede, without deciding, that “the persons engaged in the trade of barbering do in fact constitute a class sufficiently distinct from the general community to require or justify legislation applying solely to them” and say, as was further said in the ease we are quoting from,
 
 In re Boehme,
 
 (1936) 12 Cal. App. (2d) 424, 428, 429 [55 Pac. (2d) 559, 561, 562], “This may be conceded, but the necessity still remains that the particular legislation be peculiarly appropriate to the persons engaged in that trade. . . . “ ... It seems apparent to us that the real object in view was . . . plainly to restrict competition among the owners of the shops. Such an object is certainly not within the police power under our Constitution’.”
 

 Apparently by the ordinance under consideration neither telephone nor radio advertising of prices is prohibited and the prerogative of oral solicitation remains unimpaired. It does not appear that the acquirement of knowledge by a customer before he enters a barber shop of the price he is to be required to pay for services therein is detrimental to the morals or general welfare of the barber, the customer or the public at large. Tet written or printed advertising of prices of services “in any publication, handbill or notice whatsoever” is absolutely prohibited, and any price list inside the shop must be so displayed as not to be visible from outside the shop. The only apparent purpose of such provisions is to make it necessary for a prospective customer to advance so far within the portals of a barber shop, before learning the prices to be charged him therein for the work he desires, as to discourage him from a departure should those prices seem to him more than he should pay. Such an object would be as distasteful to the many fair-minded barbers as it would be to timid customers. It is not in complete accord with those ethical and honest concepts of freedom and fair dealing in contracts underlying American institutions and is repugnant to, rather than within, the police power. A classification based on the possibility of seeing a price list while outside the shop rests on no natural, constitutional or
 
 *Supp. 777
 
 intrinsic distinction justifying it and is arbitrary and void. Likewise so far as advertising the price of a given service or commodity is concerned, there being involved in the distinction itself no question of public welfare, we see no rational ground for discriminating between the senses and prohibiting the dissemination by visual means of that information which orally may be communicated. Advertising in various ways has been from time to time the subject of regulatory legislation under the police power, but absolute prohibition, irrespective of considerations of public welfare, of printed advertising of prices of services or commodities which may lawfully be offered for sale, and which may be legally advertised otherwise than visually, has no constitutional justification.
 

 With reference to the distinction between “regulation” and “prohibition” of that which is otherwise lawful, the District Court of Appeal in
 
 Pacific Railways Advertising Co.
 
 v.
 
 City of Oakland,
 
 (1929) 98 Cal. App. 165, 171, 172 [276 Pac. 629], said: “In the case of
 
 Varney & Green
 
 v.
 
 Williams,
 
 155 Cal. 318, 320 [100 Pac. 867, 132 Am. St. Rep. 88, 21 L. R. A. (N. S.) 741], the ordinance made ‘no attempt to restrict the operation of the enactment to billboards that may be insecure or otherwise dangerous, or to advertising that may be indecent,’ but prohibited all billboards, just as this ordinance prohibits
 
 all
 
 advertising and
 
 all
 
 frames (on street cars). In holding the ordinance invalid the Supreme Court said: ‘The town trustees have undertaken to make criminal the maintenance of any billboard, however securely it may be built, and however unobjectionable máy be the advertising matter displayed upon it. Such prohibition, involving a very substantial interference with the rights of property, can be justified, if at all, only to the extent that the subject matter of the legislation is embraced within the police power of the state. ... We are not here, however, concerned with the extent to which the legislative power may, in the effort to protect the public safety or morals, regulate the manner of erecting or using billboards. The ordinance in question does not attempt such regulation, but undertakes to absolutely forbid the erection or maintenance of any billboard for advertising purposes. We have no doubt that this sweeping prohibition wás beyond the power of the town trustees.’ ”
 

 
 *Supp. 778
 
 The Supreme Court of California in
 
 Ex parte Jentzsch, supra,
 
 said: “We are a self-governing people, and our just pride is that our laws are made by us as well as for us. Every individual citizen is to be allowed so much liberty as may exist without impairment of the equal rights of his fellows. Our institutions are founded upon the conviction that we are not only capable of self-government as a community, but what is the logical necessity, that we are capable, to a great extent, of individual self-government. If this conviction shall prove ill-founded, we have built our house upon sand.”
 

 To uphold the ordinance here involved would be to encroach upon the right of property and of contract and to impair freedom of speech and the press. Police power may regulate reasonably but it must not prohibit arbitrarily. The constitutional liberty of speech “implies the right to freely utter and publish whatever the citizen may please . . . and . . . immunity from legal censure and punishment for the publication
 
 so long as it is not harmful in its character vjhen tested by such standards as the law affords”
 
 (Cooley's Constitutional Limitations, p. 421), and “what may be spoken may be written”.
 
 (In re Shortridge,
 
 (1893) 99 Cal. 526, 535 [34 Pac. 227, 37 Am. St. Rep. 78, 21 L. R. A. 755].)
 

 We conclude that the prices of services in the barber shop of East First Street may be displayed visibly outside of that shop as well as whispered in the ear of a customer within, and published on the pages of the printed daily likewise as they may be broadcast by radio into our homes.
 

 The judgment is reversed and the cause remanded to the Municipal Court of the City of Long Beach with directions to dismiss the complaint.
 

 Shaw, P. J., concurred.