[Crim. No. 421. Fourth Appellate District.—July 22, 1937.]

In the Matter of the Application of A. L. KAZAS for a Writ of Habeas Corpus.

Victor H. Parry and Don R. Holt for Petitioner.

R. Y. Burum, Walter Osborn, Morris Chain and John Shortridge for Respondent.

MARKS, J.—This is an original proceeding wherein petitioner seeks release from confinement under the charge of violating the provisions of Ordinance Number 495, New Series, of the City of Bakersfield.

We quote the pertinent provisions of this ordinance as follows:

"Section 1. The existence of a national, state and local emergency productive of widespread unemployment and disorganization of trade and industry which affects the peace and welfare of all the people of this city, is hereby recognized, and among the trades and industries particularly affected are those in which service is rendered to the public without necessarily involving the sale, manufacture or transportation of merchandise or commodities. The practice of barbering is a trade so affected and in which there is widespread unemployment and economic distress, and the owners, operators and managers of more than eighty per cent of the barber shops in the City of Bakersfield have applied to the City Council for the establishment of a code of fair competition for barber shops and the practice of barbering in the city of Bakersfield. For the purpose of ameliorating such conditions it is necessary and desirable to establish a code of fair competition applicable to such barber shops and the practice of barbering in the city of Bakersfield.

"Section 2. As used herein, the practice of barbering is hereby defined to be any of or any combination of the following practices for the hire or reward:

"Shaving or trimming the beard or cutting the hair;

"Giving facial and scalp massages or treatments with oils, creams, lotions or other preparations either by hand or mechanical appliances;

"Singeing, shampooing, arranging, dressing, curling, waving or dyeing the hair or applying hair tonics; provided that the word 'waving' as herein used does not include permanent waving;

"Applying cosmetic preparations, antiseptics, powders, oils, clays or lotions to scalp, face or neck.

"As used herein the term 'barber-shop' is hereby defined to embrace and include any establishment or place of business wherein the practice of barbering as hereinabove defined is engaged in or carried on.

"Section 3. (a) All barber shops in the city of Bakersfield shall charge and receive compensation for barbering services therein rendered, not less than the prices set forth in the following schedule:

Haircut .....................................50c

Shave ......................................35c

No service rendered for less than..............25c

"(b) No combination of services mentioned in the foregoing schedule shall be rendered for a price less than the total of the minimum price which may be charged for each such service separately.

"(c) The allowance of rebates, refunds or unearned discounts or the use of any method of subterfuge to defeat the prices specified in the foregoing schedule shall constitute a violation of this act.

"(d) This ordinance shall have no application to services rendered by student barbers or operators in any regularly established barber school or school of cosmetology in this city. . . .

"Section 5. Any person, firm or corporation violating any of the provisions of this ordinance shall be guilty of a misdemeanor and upon conviction thereof shall be punishable by a fine of not more than One Hundred Dollars ($100.00) or by imprisonment in the County Jail for not more than thirty (30) days, or by both such fine and imprisonment. Each and every day's continuance of such violation shall constitute a separate offense."

Petitioner is a barber with an established place of business in the city of Bakersfield. He is charged with having cut the hair of N. J. Nichols for thirty-five cents, and with having shaved him for twenty-five cents.

■ The ordinance in question so nearly conforms to the provisions of the act of the legislature approved by the Governor on July 20, 1935 (Stats. 1935, p. 2212), that it was presumably passed under authority of that act. If the ordinance can be sustained as constitutional it must be because it is a reasonable exercise of the police power of the city of Bakersfield. Under the Constitution (sec. 11, art. XI) the city of Bakersfield is given, within its limits, police powers equal in extent to those of the state, which powers it may exercise by ordinances not in conflict with general laws. (*Ex parte Daniels*, 183 Cal. 636 [192 Pac. 442, 21 A. L. R. 1172]; *In re Maas*, 219 Cal. 422 [27 Pac. (2d) 373].) It would therefore seem that the act of the legislature conferred no power on the city that it did not already possess.

The police powers extend to legislation promoting the public health, safety, morals and general welfare of a people. ■ If the ordinance in question is a legal exercise of the police power it must be because it tends to promote the general welfare of the people of Bakersfield. It does not pretend to concern itself with the health, safety or morals of the people. The health and sanitary legislation applying to barber shops is found elsewhere. (Stats. 1927, p. 1748; 1935, pp. 1015, 1603.) (See, also, *Ganley* v. *Claeys*, 2 Cal. (2d) 266 [40 Pac. (2d 817]; *In re Boehme*, 12 Cal. App. (2d) 424 [55 Pac. (2d) 559].)

The record before us shows that at the time of the adoption of the ordinance there were forty-six barber shops in the city of Bakersfield; that forty-three of them petitioned the city council for the enactment of an ordinance establishing a code of fair competition for the barber trade; that the ordinance was thereafter enacted. It is not in evidence that the city council made, or caused to be made, any investigation of any condition of unemployment in the barber trade in Bakersfield, its need of the ordinance or the effect of the enactment on barbers, their patrons or the general public. ■ We may take judicial notice that the population of Bakersfield is about twenty-five thousand.

It is clear that the ordinance had as its sole object the attempt to regulate prices charged by barbers. It fixed a minimum below which no barber could go without subjecting himself to the penalties provided in section five. It took no cognizance of differences in skill possessed by different mem-

bers of the trade, differences in equipment in separate shops, or differences in costs in conducting any of them. Figuratively speaking, it attempted to pour all barbers and barber shops into a common mold, turning them out exactly alike regardless of skill or efficiency of operation, excellence and completeness of equipment, desirability of location or expense of conducting business.

It must be admitted that the reports of a date prior to a few years ago are full of decisions which without deviation would furnish authority for peremptorily denying to Bakersfield the power it sought to exercise in fixing a minimum price barbers could legally charge for their services. There was a time when legislation to promote the public welfare was not included within any conception of the police powers if promotion of the general welfare as then understood did not concern itself with the promotion of the public health, safety or morals. The interpretation of the law has progressed with the advancement of society. The course of this evolution is aptly described in *People* v. *Nebbia*, 262 N. Y. 259 [186 N. E. 694], as follows:

"Doubtless the statute before us would be condemned by an earlier generation as a temerarious interference with the rights of property and contract (*Matter of Jacobs*, 98 N. Y. 98 [50 Am. Rep. 636]; *Lochner* v. *New York*, 198 U. S. 45 [25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann. Cas. 1133]); with the natural law of supply and demand. But we must not fail to consider that the police power is the least limitable of the powers of government and that it extends to all the great public needs; that constitutional law is a progressive science; that statutes aiming to establish a standard of social justice, to conform the law to the accepted standards of the community, to stimulate the production of a vital food product by fixing living standards of prices for the producer, are to be interpreted with that degree of liberality which is essential to the attainment of the end in view. (*Austin* v. *City of New York, supra,* page 117 of 258 N. Y. 113 [179 N. E. 313]); and that mere novelty is no objection to legislation. (*People ex rel. Durham Realty Corp.* v. *LaFetra*, 230 N. Y. 429 [130 N. E. 601, 16 A. L. R. 152].)

"The state courts should uphold state regulation whenever possible. They should be clearly convinced that a statute

is unconstitutional before they declare it invalid. Cf. *Ives* v. *South Buffalo Ry. Co.,* 201 N. Y. 271 [94 N. E. 431, 34 L. R. A. (N. S.) 162, Ann. Cas. 1912B, 156], with *Arizona Employers' Liability Cases, supra* (250 U. S. 400 [39 Sup. Ct. 553, 63 L. Ed. 1058, 6 A. L. R. 1537] ; also cf. *People ex rel. Rodgers* v. *Coler,* 166 N. Y. 1 [59 N. E. 716, 52 L. R. A. 814, 82 Am. St. Rep. 605], with *Atkin* v. *Kansas, supra,* 191 U. S. 207 [24 Sup. Ct. 124, 48 L. Ed. 148] ).''

 To this we may add that all presumptions are in favor of the constitutionality of a legislative enactment. (*Bristol-Myers Co.* v. *Tischauser,* 18 Fed. (Supp.) 228.)

We will not concern ourselves with the earlier decisions to which we have above referred, but will review some of the more modern cases.

The reasons for the passage of the ordinance in question here are set forth in its section one. The existence of a state, national and local emergency that has produced widespread unemployment and disorganization of trade and industry which affects the peace and welfare of all the people of Bakersfield is there declared; that barbering is a trade thus affected; that for ameliorating such condition in that trade it is necessary that a code of fair competition be adopted for barbers is also declared.

Since early in 1933 it has almost become a legislative habit to adopt laws and ordinances containing declarations of such an emergency in almost the exact language used by the Bakersfield city council. In some instances that legislation was enacted after much study, investigation, taking of evidence and the making of findings by a fact finding body, which findings fully justified the legislative conclusion. (*Agricultural Prorate Com.* v. *Superior Court,* 5 Cal. (2d) 550 [55 Pac. (2d) 495] ; *People* v. *Nebbia, supra; Nebbia* v. *New York,* 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469].) In other cases the laws were just enacted.

In considering this subject we should weigh the words of the Supreme Court of the United States in *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398 [54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481] :

''Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of

power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system.

"While emergency does not create power, emergency may furnish the occasion for the exercise of power. 'Although an emergency may not call into life a power which has never lived, nevertheless emergency may afford a reason for the exertion of a living power already enjoyed.' *Wilson* v. *New,* 243 U. S. 332, 348 [37 Sup. Ct. 298, 302, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024]. The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. Thus, the war power of the federal government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties. When the provisions of the Constitution, in grant or restriction, are specific, so particularized as not to admit of construction, no question is presented. . . . But, where constitutional grants and limitations of power are set forth in general clauses, which afford a broad outline, the process of construction is essential to fill in the details. This is true of the contract clause."

After citing the cases of *Block* v. *Hirsh,* 256 U. S. 135 [41 Sup. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165], *Marcus Brown Holding Co.* v. *Feldman,* 256 U. S. 170 [41 Sup. Ct. 465, 65 L. Ed. 877], and *Edgar A. Levy Leasing Co.* v. *Siegel,* 258 U. S. 242 [42 Sup. Ct. 289, 66 L. Ed. 595], dealing with legislation passed during the emergency following the World War, that court continued:

"The Court also decided that, while the declaration by the Legislature as to the existence of the emergency was entitled to great respect, it was not conclusive; and, further, that a law 'depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid

when passed'. It is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends. *Chastleton Corp.* v. *Sinclair*, 264 U. S. 543, 547, 548 [44 Sup. Ct. 405, 406, 68 L. Ed. 841]."

We take it that without evidence or proper findings of fact by a competent fact finding body produced before its members, a legislative body should go no further, in declaring the existence of a condition of emergency which depends for its existence on the truth of certain facts, than a court can go in taking judicial notice of a general factual condition; that judicial notice is thus limited; "that the matter be one of common and general knowledge, that it will be well established and authoritatively settled, be practically indisputable, and this common, general and certain knowledge exist in the particular jurisdiction". (*Wood* v. *Kennedy*, 117 Cal. App. 53 [3 Pac. (2d) 366, 369]. See, also, *People* v. *Tossetti*, 107 Cal. App. 7 [289 Pac. 881].)

The question of the existence of the emergency resulting from the recent widespread and disastrous financial depression has been in sharp dispute for at least the past nine months. It has been asserted that we have now emerged from the depression and only need to guard against following a path that will lead into another. Departments of our national government have reported prices of many commodities climbing towards the peak that preceded the disastrous break of 1929. It is confidently asserted that the financial condition of the great farm population and of those engaged in many industries has reached a point that must be regarded as normal. While there is unemployment, its extent is not definitely known. Some economists point to the fact that we have always had and always will have unemployment because of the refusal of some and the incapacity of others to work. They maintain that under our present social, industrial and economic structure the present condition of unemployment is near normal. On the other hand, these assertions are all denied by many whose opinions are entitled to great weight.

Under such confusion of thought and statement we would hesitate to hold that a court could take judicial notice of and declare the existence of an emergency arising from the recent depression. It should follow that little importance should be attached to the declaration of an emergency by the city

council of the city of Bakersfield as the ordinance in question was passed on March 17, 1937, several months after the debate to which we have alluded became vocal. (See *Standard Oil Co.* v. *City of Bowling Green,* 244 Ky. 362 [50 S. W. (2d) 960], and cases there cited.)

However, we do not regard the declaration of an emergency by the city council of Bakersfield necessarily of controlling importance here. While such an emergency might serve as the occasion for bringing into activity the latent power to legislate for the public welfare, where such powers actually existed, yet the emergency itself could not create such a power when not possessed by the legislative body. (*Home Building & Loan Assn.* v. *Blaisdell, supra.*)

We must next turn to the questions, (1) what is a definition of the public welfare, and, (2) what trades, avocations and professions may be regulated under it.

The term "public welfare" has never been given a fixed or static definition. The development of the judicial definition of its scope is illustrative of the progressive thinking of the judiciary and its forward march to keep abreast with sociological, political and moral progress. Where constitutions are restrictive in their positive terms courts are powerless to change them by interpretation. That power is vested solely in the sovereign people to be exercised only by way of constitutional amendment. Where the constitutional powers granted or withheld are defined in general terms that permit of judicial construction there arises the sole power of the courts to meet by definition the changes wrought by progress and social development. That is the limit of capacity given to the courts. To change by judicial interpretation positive constitutional grants or limitations would amount to a judicial usurpation of authority that would take from the people their sovereign power of the exclusive right of constitutional amendment. The courts have never sought to encroach upon this power nor could they do so without destroying the very foundation of our form of government which, since its organization, has vested supreme authority in the people. Herein lies the contrast to that of the government against which the Revolutionary War was fought, where power of oppression was vested in a king. In this country it should still be true that just governments are established "deriving their just powers from the consent of the governed" and not in a

government where those powers are vested in a single authority possessing the right to alter or abolish constitutional guaranties at will.

When legislation for the general welfare was first feebly recognized as an incident or component part of the police power the definition was not much more comprehensive than the then recognized power to legislate for the public health, safety and morals. It was then first extended to include legislation regulating property which by its nature had been dedicated to public use, for it was thought just to hold that where a person had entered the field of public service in the use of his property he must have impliedly consented to its regulation by public agencies for the public welfare. (*Munn* v. *People of Illinois*, 94 U. S. 113 [24 L. Ed. 77].)

The foregoing rules have been extended in recent years. In *Agricultural Prorate Com.* v. *Superior Court*, 5 Cal. (2d) 550, the lemon prorate case, it is said, at page 582 [55 Pac. (2d) 495]:

''The lemon industry which is directly concerned in this proceeding, as appears by the record before us, affects an exceedingly large number of citizens of the state. The investment therein runs into millions of dollars. Its success contributes in a large measure to the prosperity of the state, and its destruction would be no less than a public calamity, not only to this state but to all those residing without its limits. We do not feel that we are in any way or to any extent extending the principles of law enunciated in the authorities cited above by holding that such a business is so *affected with a public interest or clothed with a public use* as to justify the state in the exercise of its police power to impose such reasonable regulations upon the quantity of the commodity that may be produced and marketed therein as will save the industry from destruction from ruthless competition, the direct effect of over-production. The restraint imposed by the statute operates only upon the quantity to be produced and the amount to be marketed.'' (Emphasis ours.)

It seems to be generally admitted at this time that where a business is ''affected with a public interest or clothed with a public use'' it may be regulated under the general welfare division of the police power. (See *Nebbia* v. *New York, supra; Borden's Farm Products Co.* v. *Ten Eyck,* 297 U. S.

251 [56 Sup. Ct. 453, 80 L. Ed. 669]; *Home Building & Loan Assn.* v. *Blaisdell, supra.*)

The phrase "affected with a public interest" never seems to have been exactly defined, and perhaps it should not be because of the everchanging conditions of our social structure and the necessity of judicial interpretation to keep abreast of social progress. However, a study of the cited cases, and of as many others as we have been able to discover, discloses one constant principle running through all, namely, that the regulated trade must affect the prosperity of a large part of the members of the body politic. The Nebbia case involved a milk price fixing statute. Of course, milk is in constant use in almost every family and is a necessary part of the diet of the young, so much so that a constant supply of pure milk might easily be said to be necessary to promote the health of that important part of our population. The regulation of that industry might easily be held to fall under that portion of the police power which gives to government the right to regulate industry to promote the public health. The Borden's Farm Products Company case was also concerned with a milk price regulating enactment that was only permitted as a temporary measure during a disturbed condition of that industry. The Home Building & Loan Association case involved a statute of Minnesota which provided that during the emergency then existing in that state the time for sales of property under execution and in foreclosures be extended under certain conditions. The Supreme Court of Minnesota upheld the statute (189 Minn. 422 [249 N. W. 334, 86 A. L. R. 1507]; 189 Minn. 448 [249 N. W. 893]), as did the Supreme Court of the United States, on the dual grounds that the legislation was procedural and was justified under the general welfare phase of the police power as it affected the welfare of a great many people in the state. It was there held that a state may pass legislation that may result "in directly preventing the immediate and literal enforcement of contractual obligations by a temporary and conditional restraint, where vital public interests would otherwise suffer". (*Home Building & Loan Assn.* v. *Blaisdell, supra.*)

We may thus fairly conclude that the term "general welfare" means just what it literally implies, namely, that legislation to be justified and supported by that term must

at least promote the welfare of the general public as con-
trasted with that of a small percentage or insignificant
numerical proportion of the citizenry. This conclusion is
supported by every case on that subject which we have cited
and many others we have read.

In *United States* v. *Butler*, 297 U. S. 1 [56 Sup. Ct. 312, at
319, 80 L. Ed. 477, 102 A. L. R. 914], it is said:

"Since the foundation of the nation, sharp differences of
opinion have persisted as to the true interpretation of the
phrase (general welfare). Madison asserted it amounted
to no more than a reference to the other powers enumerated
in the subsequent clauses of the same section; that, as the
United States is a government of limited and enumerated
powers, the grant of power to tax and spend for the general
national welfare must be confined to the enumerated legis-
lative fields committed to the Congress. In this view the
phrase is mere tautology, for taxation and appropriation are
or may be necessary incidents of the exercise of any of the
enumerated legislative powers. Hamilton, on the other hand,
maintained the clause confers a power separate and distinct
from those later enumerated, is not restricted in meaning by
the grant of them, and Congress consequently has a sub-
stantive power to tax and to appropriate, limited only by the
requirement that it shall be exercised to provide for the
general welfare of the United States. . . .

"That the qualifying phrase must be given effect all ad-
vocates of broad construction admit. Hamilton, in his well-
known Report on Manufactures, states that the purpose must
be 'general, and not local'. . . . Story says that if the tax
be not proposed for the common defense or general welfare,
but for other objects wholly extraneous, it would be wholly
indefensible upon constitutional principles. And he makes
it clear that the powers of taxation and appropriation extend
only to matters of national, as distinguished from local, wel-
fare."

That the right to fix minimum hours of labor and minimum
wages for women was founded not only on the right to
legislate for the good of that large proportion of our popula-
tion but also for the welfare of the entire race appears in
*West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379 [57 Sup. Ct.
578, 81 L. Ed. 703, 108 A. L. R. 1330], where it is said:

"That phase of the subject received elaborate consideration in *Muller* v. *Oregon,* (1908) 208 U. S. 412 [28 Sup. Ct. 324, 326, 52 L. Ed. 551, 13 Ann. Cas. 957], where the constitutional authority of the state to limit the working hours of women was sustained. We emphasized the consideration that 'woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence' and that her physical well being 'becomes an object of public interest and care in order to preserve the strength and vigor of the race'. . . . We concluded that the limitations which the statute there in question 'places upon her contractual powers, upon her right to agree with her employer, as to the time she shall labor' were 'not imposed solely for her benefit, but also largely for the benefit of all'." (See, also, *Helvering* v. *Davis,* 301 U. S. 619 [57 Sup. Ct. 904, 81 L. Ed. 1307, 109 A. L. R. 1319].)

When we apply these descriptions of "general welfare" to the facts of the instant case we conclude that the legislation in question here does not fall within their terms. The ordinance does not purport to promote the prosperity of the citizens of Bakersfield nor of any considerable class of them. It concerns itself with the welfare of a small group within a class. If we assume that there exists in Bakersfield the deplorable and chaotic condition of trade and industry which the ordinance portrays we are confronted by the question: What specific remedy is proposed by the ordinance? We are advised that there are forty-six barber shops in Bakersfield. The barbers and their families could not compose more than two per cent of the population of the city. The ordinance is a price fixing ordinance for barbers alone. The ordinance legislates for the benefit of barbers alone. It recites that there is wide unemployment in the barbering trade. To ameliorate that condition it fixes a minimum price to be charged for haircuts and shaves. The ordinance does not purport to consider the welfare of the other ninety-eight per cent of the population of the city nor the effect on them of fixing the minimum prices to be charged for cutting their hair or shaving their masculine faces. We conclude that on the face of the ordinance it affirmatively appears that the legislation was not intended to promote the general welfare of the people of Bakersfield but only a small group

composing a very small proportion of the population of that city.

We find nothing unreasonable, unjust or oppressive in the minimum prices fixed, and that feature of the case does not enter into our reasoning and has not influenced our conclusions.

■ We must next approach the question of the nature of the business, trade, occupation or profession that may be regulated by price fixing laws under the general welfare element of the police powers. As we have already seen, the broadest and most liberal interpretation of this power has been limited to activities "affected with a public interest or clothed with a public use". (*Agricultural Prorate Com.* v. *Superior Court, supra.*) The other authorities cited in this opinion and in the cited cases support this conclusion. To discuss each case in which it has been held that a line of endeavor was neither affected with a public interest nor clothed with a public use would stretch this opinion to unconscionable lengths. It would serve no purpose except by way of analogy. We take it that a case of this character should rest and be decided upon its own evidentiary facts and such other facts as fall within general knowledge.

The question before us has been decided by the appellate courts of three states. (*State* v. *Ives,* 123 Fla. 401 [167 So. 394]; *Duncan* v. *City of Des Moines,* (Iowa) 268 N. W. 547; *City of Mobile* v. *Rouse,* (Ala. App.) 173 So. 254.) In each of these cases the legislation fixing minimum prices for barbers was held violative of the Constitutions of those states and of the Constitution of the United States. In each case it was very properly held that barbering was not a business affected with a public interest or clothed with a public use. The legislation before those courts was so similar to the ordinance of Bakersfield that those cases become direct authority here. In *State* v. *Ives, supra,* it is said:

"So the question is reduced to the narrow limitations of the statewide necessity of fixing a minimum price for barber service in the interest of public health and welfare or the preservation of a trade which may be said to constitute a paramount industry of the state. We perceive no elements in the trade which make it an industry of paramount importance to the state peculiarly different from those con-

tained in other like businesses where the element of personal service is sought from skillful practitioners. . . .

"No emergency exists to justify such an extraordinary bit of legislation even measured by the alleged findings of fact by the legislative department and recited in the first section of the act. The conclusion attempted to be reached that the legislation is justified in the interest of public welfare, health and morals has been shown to rest upon one supposition piled upon another, which coincides with no known facts or other probable hypotheses. Such a regulation could be justified only upon the fact that the barber trade is a paramount industry of the state intimately connected with its welfare, so that the state may, through an agency such as the board of barber examiners, prescribe prices for the services to be rendered by each barber. . . .

"Reduced to its last analysis, the thought underlying the act seems to be not that the barber trade is a paramount industry affecting the general welfare, but that the prosperity of the barber class sufficient to maintain the average barber and his family 'properly' is a sufficient reason for the exercise by the state of the power of direction, control and management of the barber business in the interest of health and morals. And, further, that the liberty of contract enjoyed by every barber engaged in his vocation is used by him or likely to be so used by him as to imperil the business and jeopardize the public health, morals and general welfare.

"We find in none of the cases support, directly or indirectly, of such a notion of democratic government or constitutional liberty."

Respondent seeks to escape the effect of the last cited cases by pointing out that in each of them the case of *Adkins* v. *Children's Hospital*, 261 U. S. 525 [43 Sup. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238], was cited as supporting authority. It is urged that as the Adkins case has been overruled since the rendition of those decisions (*West Coast Hotel Co.* v. *Parrish, supra*) we should not now consider them as announcing sound principles of law. It is true that the Adkins case was cited in each of these three opinions but so were many other cases. The Adkins case was only cited in support of one of several grounds upon which the legislation was held unconstitutional. The reasoning of the courts and the other authorities cited,

independent of the Adkins case, fully support the conclusions reached.

Respondent cites the case of *In re Lasswell*, 1 Cal. App. (2d) 183 [36 Pac. (2d) 678], as controlling here. That case held constitutional the California Industrial Recovery Act (Stats. 1933, p. 2632), commonly called "The Little N. R. A." Among other things, Lasswell, a cleaner and dyer, was accused of cleaning and pressing a woman's dress for fifty cents and a man's suit for the same price, contrary to the code of fair competition adopted to regulate the cleaning and dyeing industry. The California Industrial Recovery Act, the decision states, adopted the National Industrial Recovery Act. In remanding Lasswell, the court reached the conclusion that both acts were constitutional. After the decision in the Lasswell case the National Recovery Act was held unconstitutional by the Supreme Court of the United States in an unanimous decision, all justices concurring. (*A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 [55 Sup. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947].)

As we have before remarked, we believe that under the general welfare phase of the police power the constitutional power to regulate prices charged in service trades, assuming any such power exists, should depend to a certain extent on the factual situation shown in each case presented. Due consideration by all concerned should be given to the effect of the legislation on the general welfare and whether the particular trade is affected with a public interest or clothed with a public use. The opinion in the Lasswell case does not disclose the condition of the record on either of these questions. That case dealt with the trade of cleaning and dyeing. We are considering the trade of barbering. Therefore, we do not consider the Lasswell case as controlling here especially since the National Industrial Recovery Act has been held unconstitutional since its decision.

We do not consider the decisions in the cases of *Max Factor & Co.* v. *Kunsman*, 5 Cal. (2d) 446 [55 Pac. (2d) 177], *Kunsman* v. *Max Factor & Co.*, 299 U. S. 198 [57 Sup. Ct. 147, 81 L. Ed. 122[, and *People* v. *Osborne*, 17 Cal. App. (2d) (Supp.) 771 [59 Pac. (2d) 1083], sufficiently close factually to the instant case to require separate discussion. They are of little assistance here. However, the case of

*In re Mark,* 6 Cal. (2d) 516 [58 Pac. (2d) 913], lends support to the conclusions reached by us.

To summarize our conclusions: (1) We do not regard the finding in the ordinance of an emergency in business and trade in Bakersfield to be necessarily controlling. (2) The private advantage of a small group, not a class, composing a small percentage of the population of Bakersfield does not make a price fixing ordinance for that group alone legislation for the general welfare of the inhabitants of Bakersfield. (3) The trade of barbering is not "affected with a public interest or clothed with a public use". For these reasons we hold the ordinance of Bakersfield in question here violative of the provisions of both the federal and state constitutions.

The petitioner is discharged and his bail is exonerated.

Barnard, P. J., and Jennings, J., concurred.