## JONES et v BONTEMPO et

Common Pleas Court, Hamilton Co.

Nos. A-67859, A-69869. Decided January 15, 1940.

George Weller, Jr., Cincinnati for plaintiff.

Thomas J. Herbert, attorney general, and Fred W. Edmonston, assistant attorney general, Columbus, for defendants.

## OPINION

By MACK, J.

Each of these captioned cases involves the validity and constitutionality of an amendment to the statutes of Ohio creating the State Board of Barber Examiners, and regulating the business of barbering, which amendment authorizes such board to refuse to issue or renew, or to suspend or revoke any certificate of registration issued to a barber, on account of "advertising of prices of barber services in any form whatsoever by any person, persons, firm or corporation". In each case a petition has been filed in this court under §1081-18, GC. Each petition states defendants constitute the Board of Barber Examiners; that plaintiff is the owner of a barber shop in Cincinnati and was practicing barbering and conducting his business by virtue of a certificate of registration issued to him by defendant Board; that plaintiff received a notice that he was found guilty of violating §1081-17(3), GC, and that his certificate of registration was suspended; that plaintiff is dissatisfied with the decision of defendant Board suspending his certificate of registration, and prays that the decision of said Board be set aside and vacated on the grounds that same is unreasonable, unlawful and unconstitutional. No answer, motion or demurrer was filed in either case, but each case has been submitted upon an agreed statement of facts, which, briefly stated, sets forth that the plaintiff in each case violated §1081-17(3), GC, in that "he advertised on his window the price of hair cutting done or to be done in his barber shop at a price of twenty-five cents to all customers," and that being requested to desist such practice did continue the same, whereupon an affidavit was sworn to by an inspector of the board, alleging such violation, and that the board found plaintiff guilty and suspended his certificate of registration.

For the purposes of the record herein it is suggested that an answer in each case be filed, setting forth that the suspension in question was on account of such advertising of price for hair cutting in the window of plaintiff's shop, and that a demurrer be filed to such answer. Such pleading would then raise the question of constitutionality upon the record, of the quoted provision, rather than have it raised by a mere agreement as to the facts and briefs of counsel upon the constitutionality of the provision in question. We approach a decision fully bearing in mind the rule that courts should adopt the construction of a statute which upholds it if such course is possible. We are thoroughly impressed with what was said by Judge Parker of the United States Circuit Court of Appeals in a recent address:

"It is unreasonable violation of the rights of the individual which is forbidden to government, not reasonable regulation of matters which have come to be matters of social concern and which affect the life and future of a whole people."

It is well settled that a license is neither a charter nor a contract, and that its grant may be withheld and its revocation effected at any time, provided that such actions are not influenced by unreasonable and arbitrary considerations, nor amount to a denial of what is secured by the Bill of Rights.

In the consideration of these cases we are not concerned with the power of the legislature to fix prices for services of barbers, on the theory that their profession is "affected with public interest," but we shall state our conclusions solely with reference to the power of the legislature to prohibit a barber advertising in any form the compensation he will demand for any service of his profession.

Under our form of government (federal, state or municipal) it has always been the acknowledged right of the laborer (in the absence of a valid code of charges) to advertise the price he expects for his services. There is not an iota of fraud in this, nor does such

advertisement in any manner whatever touch the public health, safety, morals or welfare. Indeed, one would naturally expect that an unadvertised price, stated **post factum**, might result in a demand so unreasonable that its non-advertisement might be actuated by fraudulent intent. Surely honest, open dealing can never bear such taint. It is inconceivable how the true expression of a fact, such as the amount asked for service, can in any remotest degree affect the public health, morals, safety or welfare.

Not even one, whose imagination enables him to thoroughly comprehend the art of the school of post impressionism or cubism, could upon any hypothesis whatever conjure up any relationship between posting a price for service and the public health, safety, morals or welfare.

By an act passed June 8, 1933, the legislature of Ohio created the State Board of Barber Examiners and regulated the business of barbering (115 Ohio Laws 312 to 321). Such law became §§1081-1 to 1081-27, GC, inclusive. Clearly such law was authorized in the interests of public health and morals. A reference to Section 17 thereof will illustrate this, because it authorized the board to either refuse to issue or renew, or gave power to suspend or revoke any certificate of registration for conviction of a felony, barbering by a person knowingly having an infectious or contagious disease, advertising by means of knowingly false or deceptive statements, advertising or practicing under a name other than one's own, habitual drunkenness, or addiction to use of morphine, etc., immoral or unprofessional conduct, etc., etc.

It will be noted that under such original act §1081-17(3) originally forbids "advertising by means of knowingly false or deceptive statements."

In 1937 (117 Ohio Laws, at page 342) there was added to the quoted words of §1081-17(3) the words "and advertising of prices of barber services in any form whatsoever by any person, persons, firm or corporation". It will thus be seen that while the original wording was for the purpose of protecting the public against fraud or deception, yet the added words in no respect whatever had such purpose, █ nor do such added words relate in any respect to public health, safety, morals or general welfare.

Whatever may be the views of a court in observing the oath to administer justice, nevertheless trial judges are bound by authoritative rulings of the reviewing courts and hesitate to reach a conclusion contrary to the persuasive declarations of courts of other states. Accordingly we turn from our own impressions to adjudicated cases in order to determine whether our conclusions have a substantial basis.

Notwithstanding the rule as to the granting or withholding of a license, and notwithstanding §1081-18, GC, expressly authorizes this court to set aside, vacate or modify any decision of the Board of Barber Examiners "on the ground that the same is unreasonable or unlawful," it has long been established in this state that courts will review a license law, which, by reason of operating unequally, violates the constitutional rights of a citizen. State v Gardner, 58 Oh St 599; Harmon v State, 66 Oh St 249.

It was said by the Supreme Court in State ex rel Monnett v Buckeye Pipe Line Co., 61 Oh St 520, speaking through Shauck, CJ., at page 548, with reference to the inviolability of the rights of liberty and property, except as such rights are limited by public welfare or the exercise of police power:

"Although that power may not be conclusively defined, its nature and attributes have been the subject of much investigation. In all considerate discussions of the subject it is conceded that in the exercise of this power the legislature can prohibit only those uses of property which are hurtful in a legal sense."

In Tea Company v Tippecanoe, 85 Oh St 120, at 127, the court said, per Shauck, J.:

"So much has been said respecting the guaranties of such constitutional provisions as are contained in our Bill of Rights demonstrating that the guaranteed right to the enjoyment and use of property includes the right to make contracts generally, that the cases cited in the briefs show that it has become common knowledge that the general assembly may not by the discriminating imposition of burdens participate in the rivalries of business, except to the extent that may be authorized by consideration of the public weal."

We remind of **Art. I, Sec. 1, Ohio Constitution,** setting forth the Bill of Rights and stating:

"All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, and acquiring, possessing and protecting property, and seeking and obtaining happiness and safety."

Likewise, we remind of the Constitution of the United States, Art. V of the Bill of Rights, which forbids a person being "deprived of life, liberty or property without due process of law," and Art. XIV of the amendments to such Constitution:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Reference is made in the brief for defendants to **Feeman v State of Ohio, 131 Oh St 85, 5 OO 409.** That per curiam opinion is in no respect applicable to the question raised in the instant cases. Such opinion declared that inasmuch as the legislature, in §1081-21, announced that certain unsanitary methods shall be unlawful, therefore there was no delegation of power to the

Board of Examiners by authorizing it to enforce such regulation in the exact language of the statute. The gist of the opinion is at page 88:

"Had the state boards adopted a regulation making some act unlawful which the legislature did not define as being unlawful, where would be reason for the contention that such a regulation would constitute a delegation of legislative power."

Said case did not involve or consider the amendment in question to the law adopted more than a year after the decision of such case.

Reference is also made in the brief for defendants to **Wilson v City of Zanesville, 130 Oh St 286, 4 OO 311,** which not only was decided by a divided court, but which majority opinion is contrary to that entertained by a large number of distinguished members of the bench and bar of this state. Said majority opinion upheld the right of the city of Zanesville to prescribe the hours during which barber shops could be open for business in said city, on the ground that such regulation had such definite relation to the public health, morals and safety, or to the general welfare, as to constitute a valid exercise of the police power. Such majority opinion is clearly distinguishable from the cases at bar in that such decision was founded upon the assumption that the ordinance related to matters of public health and sanitation.

This is clear from the language of Williams, J. at page 295:

"It is apparent to the open mind that one who has toiled all day will not be fully capable of commanding the needed energy and attention to apply means of sanitation, and to answer the demands of cleanliness, which alone can insure the health of the barber's patrons."

It is not necessary to refer to the cases cited by Judge Jones in his dissenting opinion, because they relate to regulations prescribing the time dur-

ing which barber shops could be open for business, and not to the subject under discussion, although the reasoning of many of those cases would apply to the matter in question herein. Even assuming that the business of a barber shop is one affected with a public interest, and therefore that price fixing for services would be justifiable and constitutional, nevertheless instant cases do not relate to price fixing. Therefore the following cases referred to by counsel for defendants do not assist in determining the question involved herein, viz.: Barber Examiners v Parker. 190 La., 219; (182 Sou. R. 485); Jarvis v State Board of Barber Examiners, 183 Okla., 527, (83 Pac. 2d. 560).

Incidentally, if the validity of laws or regulations fixing prices for the services of barbers were involved, eminent authority to the contrary of the cases cited by defendant will be found in jurisdictions holding such laws or regulations unconstitutional and invalid. Duncan v Des Moines (Ia.) N. W. R. 547 (1936); City of Mobile v Rouse (Ala.) 173 Sou. R. 254, 266 (1937); State v Ives (Fla.) 167 Sou. R., 394 (1936); Ex Parte Kazas (Cal. App.) 70 Pac. (2d) 962, (1937).

A case involving the exact question involved herein, unconnected with other provisions of an act regulating the business of barbering is The People v Osborne, 17 Cal. App. R., (2d) 771, (59 Pac. 2d. 1083) decided by the Appellate Department of the Superior Court of Los Angeles County in 1936. While such decision is not that of a court of ultimate review, nevertheless it was the conclusion of a court composed of two judges, and in our opinion, is persuasive as to the conclusion reached by the court herein. That case involved a provision of an ordinance of Long Beach, providing for punishment of a barber violating the following provision:

"No advertising of prices shall be allowed on windows or on the outside of buildings, or on the street or sidewalk."

Osborne, who conducted a barber shop, did advertise prices of services rendered in the barber shop upon the outside of the bulding wherein said shop was located, and plainly visible from the outside of said building, or place of business. It is expressly stated "there was no other evidence". Defendant was found guilty and a fine and sentence was imposed upon him, as provided by the ordinance, and upon appeal such action was reversed and the complaint against Osborne ordered dismissed. It was suggested that the ordinance in question recited that these regulations were adopted on the application of an excess of 80% of the business establishments engaged in the barber trade in the city of Long Beach. At page 775 the court said:

"It seems obvious that the mere request—even the unanimous request— of those persons engaged in a certain calling for special legislation applicable to that calling can not in itself change the constitutional character of that legislation nor can the mere addition of a limited number of other vocations in a regulatory sanction which is inherently arbitrary as to the several as well as the one, make natural that which is discriminatory."

At page 776 the court said:

"Apparently by the ordinance under consideration neither telephone nor radio advertising of prices is prohibited and the prerogative of oral solicitation remains unimpaired. It does not appear that the acquirement of knowledge by a customer before he enters a barber shop of the price he is to be required to pay for services therein is detrimental to the morals or general welfare of the barber, the customer or the public at large. Yet written or printed advertising of prices of services 'in any publication, handbill or notice whatsoever' is absolutely prohibited, and any price list inside the shop must be so displayed as not to be visible from outside the shop. The only apparent purpose of such provisions is to

make it necessary for a prospective customer to advance so far within the portals of a barber shop, before learning the prices to be charged him therein for the work he desires, as to discourage him from a departure should those prices seem to him more than he should pay. Such an object would be as distasteful to the many fair-minded barbers as it would be to timid customers. It is not in complete accord with those ethical and honest concepts of freedom and fair dealing in contracts underlying American institutions and is repugnant to, rather than within, the police power. A classification based on the possibility of seeing a price list while outside the shop rests on no natural, constitutional or intrinsic distinction justifying it and is arbitrary and void. Likewise so far as advertising the price of a given service or commodity is concerned, there being involved in the distinction itself no question of public welfare, we see no rational ground for discriminating between the senses and prohibiting the dissemination of visual means of that information which orally may be communicated. Advertising in various ways has been from time to time the subject of regulatory legislation under the police power, but absolute prohibition irrespective of considerations of public welfare, of printed advertising of prices of services or commodities which may lawfully be offered for sale and which may be legally advertised otherwise than visually, has no constitutional justification."

As analogous in that the case related to a regulation of the dental profession, instead of the barber trade, there is cited in support of the constitutionality of the particular provision now in question herein, the case of Semler v Oregon Dental Examiners, 294 U. S., 608. As that decision affirmed the decision of the Supreme Court of Oregon, reported in 148 Oregon 50 (34 Pac. 2d, 311) the correct analysis thereof requires reference to the report of the state court. It appears that Oregon passed a code relating to the practice of dentistry. In said code there were provisions defining unprofessional conduct which constitute ground for revocation or suspension of a dentist's license, viz:

" 'Advertising professional superiority or the performance of professional services in a superior manner; advertising prices for professional services; advertising by means of large display, glaring light signs, or containing as a part thereof the representation of a tooth, teeth, bridge work or any portion of the human head; employing or making use of advertising solicitors or free publicity agents, or advertising any free dental work or free examination; or advertising to guarantee any dental service, or to perform any dental operation painlessly. * * *' "

The language of the complaint against Semler, a dentist, was as follows:

"It appears from the complaint that while plaintiff was engaged in the practice of dentistry he (1) employed the service of advertising solicitors; (2) used as advertising mediums large display signs and glaring light signs showing illustrations of a tooth, teeth and bridge work; and (3) advertised in the daily newspapers as follows: (a) That he had acquired superior skill and ability and knowledge in the practice of dentistry and his ability to perform the professional services of dentistry in a superior manner; (b) the prices that he would charge for various services to be rendered; (c) that he makes examinations for prospective patients without making any charge therefor; (d) that he guarantees all dental work performed by him; and (e) that dental operations are performed painlessly."

It was expressly found by the court that plaintiff did not question that part of the act relating to advertising that prohibits "making use of any advertising statements of a character tending to deceive or mislead the public."

In refusing to enjoin the threatened action of the State Board of Dental

Examiners in revoking or suspending the license of Semler for violation of the provisions of the act the court said at page 56:

"Counsel for appellant concede that the state, in the exercise of the police power, has the right to enact legislation to prevent fraud and deception in the practice of dentistry, but assert that these provisions of the act to which attention has been directed do not have such tendency and are an arbitrary interference with his right to practice his profession. It may be that the appellant acted in good faith and that the representations made in his advertisements express the truth, but such is beside the question. The more pertinent query is: Does the kind of advertising prohibited afford the unscrupulous practitioner a means of perpetrating fraud and deception upon his patients? In itself there is nothing harmful in merely advertising prices for dental work, or in displaying glaring signs illustrating teeth and bridge work, but who will doubt that practitioners not willing to abide by the ethics of their profession often resort to such advertising methods to lure the credulous and ignorant members of the public to their offices for the purpose of fleecing them. The act does not prohibit all advertising by dentists, but bars only certain specified kinds of advertising as being inimical to the public welfare. The legislature in the passage of the 1933 amendment, which strengthened and amplified prior statutory regulations relative to the practice of dentistry, undoubtedly was aware of existing conditions and believed the evils resulting from such advertising methods justified further protection to the public. We are unable to say that there was no real or substantial basis for this legislative conclusion. The burden to show to the contrary rests upon the party challenging the validity of the act."

It is thus apparent that if the case had involved simply the advertising of prices that Semler would charge for services to be rendered, a different con-

clusion would have been reached, because the court expressly said:

"In itself, there is nothing harmful in merely advertising prices for dental work."

When the case reached the Supreme Court of the United States Mr. Chief Justice Hughes in his opinion in 294 U. S., at pages 611 and 612 said:

"The state court defined the policy of the statute. The court said that while, in itself, there was nothing harmful in merely advertising prices for dental work or in displaying glaring signs advertising prices for dental work or in displaying glaring signs illustrating teeth and bridge work, it could not be doubted that practitioners who were not willing to abide by the ethics of their profession often resorted to such advertising methods 'to lure the credulous and ignorant members of the public to their offices for the purpose of fleecing them.' The legislature was aiming at 'bait advertising.' 'Inducing patronage,' said the court, by representations of 'painless dentistry,' 'Professional superiority,' 'free examinations,' and 'guaranteed dental work' was, as a general rule, 'the practice of the charlatan and the quack to entice the public.'

"We do not doubt the authority of the state to estimate the baleful effects of such methods and to put a stop to them. The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of the market place. The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. And the community is concerned in providing safeguards not only against decep-

tion, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous. What is generally called the 'ethics' of the profession is but the concensus of expert opinion as to the necessity of such standards."

It is thus likewise apparent from the opinion of the Supreme Court of the United States that had the case involved the single question of advertising prices a different conclusion would have been reached. The affirmance of the decision of the Supreme Court of Oregon was inevitable by reason of the other prohibitive practices of Semler, and which both the Supreme Courts of Oregon and of the United States found deceptive and injurious to the public welfare. In our analysis of the principle announced in the Semler case we bear in mind the admonition of that very eminent and now deceased Justice of the Supreme Court, Oliver Wendell Holmes, when he was on the bench of the Supreme Judicial Court of Massachusetts, viz:

"Too broadly generalized conceptions are a constant source of fallacy."

Goe v Gifford, 168 Va. 497 (191 S. E. Rep. 783) is a case in all respects like the Semler case and involved the revocation of the license of a dentist for violation of like provisions of the dental code of Virginia. The Virginia statute empowered the State Board of Dental Examiners to revoke or suspend the license of a dentist for the following, among other, causes:

"Advertising to practice without causing pain or advertising professional superiority or the performance of professional services in a superior manner, or advertising prices, terms, or fees for professional services, or advertising by means of large display, glaring light signs, or containing as a part thereof the representation of a tooth, teeth, bridge work or any portion of the hu-

man head, or employing or making use of advertising solicitors or free publicity press agents, or advertising any free dental work or free examinations, or advertising to guarantee any dental service, or advertising to use any drug, nostrum, patent or proprietary drug or medicine of an unknown formula, or advertising or publishing or circulating false claims or misleading statements of art, skill or knowledge, or advertising the methods of treatment or practice, or advertising in any other manner which tends to deceive or defraud the public."

Dr. Goe advertised extensively through newspapers the prices, terms or fees charged for his professional services, free dental examinations and guaranteed dental work to all who seek his services. The advertisements were illustrated with photographic cuts of teeth or bridge work.

The act was attacked as unconstitutional and void insofar as it prohibited the advertising of prices, terms or fees for professional services, free examinations, guaranteed dental services. The opinion of the court is based on the decision of the Semler case, from which numerous quotations are made.

Like the Semler case, the decision is correct without the necessity of passing upon the question whether the simple advertising of prices for services is such an act as can be legally and constitutionally prohibited.

Upon fullest consideration of the cases at bar the court is of opinion that the barber, who has been duly licensed, and as to whom no complaint is made as to his compliance with all the sanitary provisions of the barber's code, and all other provisions relating to the public health and safety and against fraud or deception of the public, has the constitutional right to place on the window of his shop that he will charge twenty-five cents for cutting hair in his shop. Any attempt of the legislature or any board to prohibit such act is in our opinion void as a denial of constitutional rights.

It follows that on the making up of the record herein the court will vacate the decision of the Board ▮▮▮ of Barber Examiners, on the ground that the same is unreasonable and unlawful, in accordance with the provision of §1081-18, GC.

Though scarcely necessary to add the following, the court desires to expressly state that it has not and does not intend to express any opinion upon any other provision of the Barber License Code or amendment thereto, except that which prohibits such an act as advertising on the window of a barber shop the price to be charged for the service of cutting hair.