REVNE v. TRADE COMMISSION et al.

No. 7061.   Decided April 5, 1948.   (192 P. 2d 563.)

See 16 C. J. S., Constitutional Law, sec. 137.  Price fixing by legislative or administrative body, see note, 119 A. L. R. 985.  See, also, 42 Am. Jur. 549.

*Grover A. Giles*, Atty. Gen., and *A. John Brennan* and *C. N. Ottoson*, Asst. Attys. Gen., for appellants.

*Stewart, Cannon & Hanson*, of Salt Lake City, for respondents.

PRATT, Justice.

Andrew Revne and the interpleaded plaintiffs are barbers maintaining single chair barber shops on the outskirts of the business districts of their respective communities where many of their clientele sought their services after working hours; and where presumably their expenses of maintaining their little shops were not as much as the shop located in the center of the business district.

Pursuant to our "Barbers Price and Hour Act," Chapter 16, Laws of Utah 1945, defendant "Utah State Barber Board" promulgated the following restrictions upon prices and hours of work for barber shops:

"Price Schedule"

```
"Hair cut ................................................$0.65
 Shave ......................................................  .40
 Hair cut (children under 14 years) ........................  .50
 Neck clip only (ladies only) ..............................  .25
 Singe .....................................................  .65
 Shampoo-plain .............................................  .65
 Shampoo-Oil or Mange ..................................... 1.00
 Shampoo-Fitch dandruff remover ...........................  .75
 Massage-Plain (head, face & neck) ........................  .65
 Face steam ................................................  .50
 Tonic .....................................................  .25
 Razor honed ...............................................  .65
```

"No service less than .25

"Barber shops shall not be open for business nor shall any barber, barber apprentice or student be permitted to operate as a barber before the hour of 8 o'clock a. m. nor after 6 o'clock p. m. on Monday, Tuesday, Wednesday, Thursday, Friday and Saturday, except that shops may remain open on Saturday and days before holidays until 7 o'clock p. m., except further, that customers in shops at the specified closing time may be serviced."

Plaintiffs instituted this action before the lower court, under the provisions of our Declaratory Judgment Act, to have this barbers law declared unconstitutional and void. The lower court found in plaintiff's favor, and the defendants appealed. Under Section 5 of the barbers act, the defendant, Trade Commission of Utah, is the enforcement agent.

The following extracts from the act are pertinent to this discussion:

"Section 1. * * *

"(2) 'Organized and representative group' means any organizatzion composed of duly licensed barbers collectively acting for the purpose of negotiating and fixing a scale of minimum price agreements and opening and closing days and hours representing 70 per cent or more of the licensed barbers within any city or county of the state of Utah.

"Section 2. Scale of Minimum Prices—How Fixed—Increase.

"Whenever a scale of minimum prices have been agreed upon, signed and submitted to the board by an organized and representative group, the board shall have power to approve such agreement and shall declare and establish within such city or county by official order the minimum prices for any and all work or barbering services usually performed in barber shops. The board shall have power to and shall make and establish a differential minimum price schedule in favor of barber colleges operating in accordance with law of not more than 70 per cent of the minimum prices to the public for similar services in barber shops. Before approving such agreements the board within thirty days after such schedule is submitted shall determine by investigation whether such suggested and proposed scale of minimum prices is reasonable and sufficient to enable barber shops in such district to operate in keeping with the purposes of this act in minimizing and relieving danger to the public health and safety.

"Any person desiring to intervene in such determination shall file a verified application in writing within ten days after such schedule of proposed minimum prices is submitted to the board setting out

fully the grounds upon which such person claims to be interested. Upon filing such application the board shall cause to be held a public hearing at which the applicant shall be entitled to be present or represented in the manner it shall deem fit and proper for the purpose of investigating and hearing such grounds.

"In determining reasonable minimum prices the board shall take into consideration the necessary costs incurred in the particular city and county in maintaining barber shops in a clean, healthful, and sanitary condition and also the wages and commissions which are customarily paid to employees in such barber shops and shall take into consideration any other facts and conditions affecting the barber profession in its relation to the public safety and health. If the board shall find after investigation or a public hearing that the minimum prices fixed in such districts are insufficient to provide adequate service for protecting the public health and safety such minimum prices may be increased from time to time.

"Section 3. Power to Fix Hours of Service.

"The board shall have power to approve and by official order to establish days and hours when barber shops may remain open for business whenever agreements fixing such opening and closing days and hours have been signed and submitted to the board by any organized and representative group and the board shall have like power to conduct public hearings and to investigate the reasonableness and propriety of the hours fixed by such agreement as is conferred under section 2 of this act.

"Section 4. Board Orders Filed with Trade Commission—In Force One Year.

"All orders of the board approving schedules of prices to be charged for barber services and agreements fixing opening and closing hours and days for barber shops as herein provided shall be filed with the trade commission and shall remain in force and effect for a period of one year after the date of approval of such order and shall be renewed annually upon its anniversary date, unless rescinded, modified, or replaced by a new agreement approved and promulgated by the board after being signed and submitted under the procedure provided in sections 2 and 3 of this act.

\* \* \* \* \*

"Section 8. General Powers of Trade Commission—Physical Examination of Barbers.

"The trade commission is hereby vested with such general powers as are necessary for administering and enforcing this act and shall require and enforce an annual physical examination of every licensed barber in Utah to be made by a legally qualified medical physician, \* \* \*." See also, Chapt. 29, Laws of Utah 1945.

Sections 9 and 10 provide penalties for violations of the act which include misdemeanor charges, and a deprivation of license to practice. Section 12 of the Act provides that a declaration of invalidity of any part of the act shall not affect other parts. Section 13 provides the annual license and license fee required, and provides that it shall be required in city or county districts in which minimum price agreements or opening and closing day and hours agreements are operative under the act, and shall expire with any such agreement.

The lower court, after finding that the act was being enforced against Andrew Revne by a cease and desist order, included these as findings of fact and as conclusions of law:

(From the findings of fact.)

"6. That the statutes hereinbefore mentioned, as interpreted and as so applied as aforesaid, and enforced by said defendants or attempted to be enforced, are invalid and unconstitutional and violate the provisions of Article I, Sections 1, 2, 7, 11, 24, 25, 26, 27, Article V, Section 1, and Article VI, Section 1 and 26, subsection 16 therof, and Article XII, Section 20 of the Constitution of the State of Utah, and the provisions of the Constitution of the United States of America known as Amendments V and XIV.

"7. That the provisions of said statute designated as the 'Barbers Price and Hour Act' requiring barber shops to close at 6 ó'clock p. m. on secular days, and requiring barbers to charge the minimum price for barber service, as hereinbefore set forth, is not valid or proper exercise, and is an unlawful extension of the police powers of this State in the regulation of the barbering profession, and said regulations bear no reasonable relation to the public health and general welfare and such statutes and regulations promulgated therein are therefore invalid."

(From the conclusions of law.)

"1. That the provisions of Chapter 16, Session Laws of Utah 1945, and particularly Sections 2, 3, 4, 5, 6, 7, 10, 11, 13, and 14 thereof, said Act also being designated as the Barbers Price and Hour Act, are invalid and unconstitutional and violate the provisions of Article I, Sections 1, 2, 7, 11, 24, 25, 26, and 27, Article V, Section 1, Article VI, Sections 1 and 26, subsection 16 thereof, and Article XII, Section 20 of the Constitution of the State of Utah, and the provisions of the Constitution of the United States of America known as Amendments V

and XIV. That the plaintiffs are entitled to an order restraining the defendant Trade Commission of Utah from enforcing the provisions of said statute."

Included within the grounds adopted by the lower court as the basis for its adjudication of unconstitutionality, is that of an unlawful delegation of legislative authority. If that is a correct view of the act there is little or no need for further discussion of the matter.

Counsel for the litigants have cited the authorities pro and con upon that issue, some of each of which we shall consider, to arrive at our views of the matter.

In support of the constitutionality of such an act, the defense cites, among others, the following cases: *Herrin* v. *Arnold,* 183 Okl. 392, 82 P. 2d 977, 119 A. L. R. 1471; and *Arnold* v. *Board of Barber Examiners,* 45 N. M. 57, 109 P. 2d 779.

On the other hand plaintiffs rely upon such cases as *La Forge* v. *Ellis et al.,* 175 Or. 545, 154 P. 2d 844; and *Hollingsworth* v. *State Board of Examiners,* 217 Ind. 373, 28 N. E. 2d 64, for their belief in the unconstitutionality of the act viewed in the light of a delegation of legislative power.

We have selected the above cases for discussion as the questions therein involved were almost identical with those of the present case. The distinction between the two groups, we believe, lies in the difference in wording of the act involved in each case. It is that distinction which accounts for the opposite results reached.

The *Herrin* case: We quote paragraphs (b) and (c) of the Oklahoma Statute pertaining to the barber's price act of that state, Sec. 12, 59 Okl. St. Ann. § 102:

"(b) The Board, after making such investigation, shall *fix*, by official order, the minimum price for all work usually performed in a barber shop.

"(c) That if the Board, after investigation made, *either upon its own initiative or upon the complaint of a representative group of barbers*, determines that the minimum prices so fixed are insufficient to properly provide healthful services to the public and keep the shops sanitary, then the Board from time to time shall have authority *to vary*

*or refix* the, minimum prices for a barber's work in each city or town affected by this act." (Italics ours.)

Particular attention is invited to the italicized words "fix," "to vary or refix," and "either upon its own initiative or upon the complaint of a representative group of barbers," as these expressions are the foundation for the court's opinion that the act is not unconstitutional. In effect the decision holds that the filing of a price agreement of the 75% of the barbers is merely a convenient way of initiating the board's power to act, but that the board may act upon its own initiative, and may fix such prices as it deems reasonable under the circumstances. In other words the board's power is not merely one of approval or disapproval. It has the duty and responsibility of ascertaining the facts itself.

The *Arnold* case: The New Mexico law is like the Oklahoma law. The board is not limited to action upon petition of 75% of the barbers. It may act upon its own initiative. Paragraph (b) of both laws is the same. Here too the question of an unlawful delegation of legislative power is discussed, the court citing and approving the *Herrin* case of Oklahoma and similar cases.

Before discussing plaintiff's cases let us consider the wording of the Utah Act. Throughout the sections (quoted) it is to be noted that the board's powers are limited to approval of agreements, and, inferentially at least, disapproval. We have no provision authorizing the board to fix prices, nor hours, upon its own initiative and no provision authorizing it to "vary or refix" prices or hours after investigation. It is limited to increasing the prices if the then existing prices are insufficient for the purposes of the act. It is noted that (section 4 quoted) the schedules of prices and hours that become final, and active from year to year are those included in the board's "order" of "approval" of "agreements," and they remain the law until rescinded, modified, or replaced by a "new agreement approved and promulgated" by the board. The board's hands are effectually bound to agreements initiated by the 70% of the barbers of the territorial unit involved.

Now as to plaintiff's citations:

The *La Forge* case [175 Or. 545, 154 P. 2d 847]: The Oregon statute is like this Utah statute, so far as the powers of the board are concerned and this is what the court has to say:

"It is urged, however, that the act should, if reasonably possible, be given a construction which would render it constitutional rather than unconstitutional, and that, under a reasonable construction, it means that the board is granted authority to fix schedules of minimum prices on its own initiative and without regard to schedules contained in agreements made by seventy per cent of the barbers of a county. Were this an admissible construction a different question would be presented, but, in our opinion to give the statute the suggested meaning would not be to construe it, but to rewrite it. For it is only after a 'scale of minimum prices' has been 'agreed upon, signed and submitted to the board of barber examiners' by seventy per cent of the licensed barbers in the county that the board is authorized to act at all. The board may then, after investigation and consideration, 'approve such agreements' and 'declare and establish  *  *  *  the minimum prices.' But if it should fail to approve an agreement it is not granted authority to establish a different scale of prices which it might find to be 'reasonable and sufficient.' There its authority ceases, and, unless and until seventy per cent of the licensed barbers of the county submit another agreement containing a scale of minimum prices which the board finds to be 'reasonable and sufficient,' the price of barbers' services remains unregulated and every barber is free to charge the price he chooses whether it be 'reasonable and sufficient' or otherwise.

"The correctness of this construction becomes the more evident from an examination of § 4, which provides that all orders of the board approving price schedules shall remain in effect for a period of one year after the date of the approval of any such order, 'and shall be renewed annually upon its anniversary date unless rescinded, modified or replaced *by a new agreement, approved and promulgated by the board, after being signed and submitted under the procedure provided in section 3 of this act.*' (Italics added.) Thus, it is seventy per cent of the licensed barbers of the county, not the board, which determines whether or not a price schedule shall continue effective for more than one year, and, even though a price schedule in effect had, due to a change in conditions, become unreasonable and insufficient, and the board should so find, it would be powerless to terminate, suspend or modify the schedule, and seventy per cent of the registered barbers in the county could keep those prices in effect by simply refraining from doing anything.
*    *    *    *    *

"The attempted delegation of authority here differs from that in the statute of Oklahoma sustained in *Herrin* v. *Arnold,* supra, and in the statute of New Mexico sustained in *Arnold* v. *Board of Barber Examiners,* supra. In the former case (183 Okl. 392, 82 P. 2d 983 [119 A. L. R. 1471]) the court said that 'the board may act with or without the submission of an agreement' and in the latter (45 N. M. 57, 109 P. 2d 787), that the board was granted 'authority "to vary or refix" from time to time the minimum price.' Under the Oregon act, the board must either take what is offered by 'a preponderant majority of a group' or do nothing."

The *Hollingsworth* case: The Indiana law gives the board approval power, too, but it has some added features among which is that specifically providing for disapproval if the prices are insufficient, or excessive. However, it has no authority to establish prices founded upon its own initiative. The activating percentage of barbers in this state is 80%. Upon a basis of reasoning similar to that of the Oregon Supreme Court, the Supreme Court of Indiana declared sections 3 and 4 of the act unconstitutional as an unlawful delegation of legislative authority. Sections 3 and 4 of that act are the equivalent of sections 2 and 3, quoted of our act.

We recognize, of course, that the legislature may properly delegate to some administrative body the duty of ascertaining the facts upon which the provisions of a law are to function, and also, that one of the methods of initiating activity on the part of that administrative body may be by petition of the citizens concerned. Such procedure is not in and of itself defective as an improper delegation of legislative authority. The question of an improper delegation of legislative authority lies embedded in the extent of the power granted to the administrative body. If the interests of the public must give way to those of a particular class, the effect is simply to permit that class to impose its will upon the administrative body and the public, be the results beneficial to the public or not.

This law was enacted as a health and safety measure in the interest of the public, and that interest should govern its functioning. However, in the procedure provided for its activation the public interest is given second place to the

interests of a 70% majority of the profession directly affected by the law. If we could properly presume that such 70% would only act in the public interest and would act when that interest necessitated action there might be argument for upholding the law. No doubt it can be said that no harm to the public can occur, as the board stands between the 70% and that public, but, the law was not passed to grant a class certain benefits so long as the public was not injured. The law was passed to protect the public health and safety by authorizing the establishment of certain prices and hours in the public interest, and yet there is no way, on behalf of the public, to initiate such security if the specified majority of the barbers refuse, for selfish reasons, to act. No other group of citizens may initiate the schedules. The board is not given power to act for the public upon its own initiative. Thus the public interest is subjected to the interests of a group who may be very antagonistic to that public interest. They cannot do the public interest any harm by action—presumably the board would stop that—but they do not have to give it any aid, either, as they may remain inactive. Thus the law creates a static situation which defeats its own purpose. Price schedules and opening and closing hours become the law when properly promulgated under the provisions of the Act. One step in that promulgation is the agreement of 70% of the barbers. If, then, the question as to whether or not a given locality shall have such law promulgated or, modified, or rescinded if already in existence, is left to the whim of this group, it is hard to escape the conclusion that legislative authority has been improperly delegated or surrendered to that class. This is not a case where the law is in existence and is submitted to the local voters, a political group, as to whether or not it shall be accepted in that locality. Under such circumstances, if they were the facts, the local vote could well be accepted as in local public interest, but not so the vote of the 70% of the barbers of that locality, an economic group, as an initiatory step to the creation of such a protective local law. We believe this act is not properly confined to the public

interest. Prices and hours established at a time justifying them may subsequently become a yoke around the neck of the public if the majority of a class choose to refrain from action.

Sections 2, 3 and 4, of the act are unconstitutional as an improper delegation of legislative authority. ◾

The judgment of the lower court is affirmed for the reasons given.

WADE, J., concurs.

LATIMER, Justice (concurring).

I concur in the results. However, I desire to elaborate more fully on the two principles I believe are controlling in the present action. The first one is discussed by Mr. Justice PRATT in his opinion and involves the right of the legislature to delegate powers to an administrative agency. The second one involves the principle of whether or not the act can be held constitutional under the broad police powers of the state. I have elected to discuss both, although the holding on the former is decisive of the case.

While I believe the record is fatally deficient in certain factual matters, in view of the fact that the parties have assumed the existence of facts necessary to have this matter determined by this court, I shall so treat the record, as the important question to be determined is not procedural; it is the constitutionality of the act.

There is no reason for discussing whether or not the act offends against the due process clause of the United States Constitution for the reason that if it offends against Article 1, Section 7 of the constitution of this state, the judgment of the trial court must be affirmed.

Before setting out some of the controlling provisions of the act, I desire to first call attention to the three separate agencies that directly participate in the overall operation and enforcement of the act. The first agency with which we need deal is the Trade Commission of Utah. Under

Section 5 of the act in question and under Subsection (5), Section 16A-2-13, Chapter 29, Laws of Utah, 1945, this body is charged with supervision and enforcement of the act. The next agency is the State Barber Board, consisting of three members appointed by the governor. While the Trade Commission is required to adopt and enforce all rules, regulations and orders necessary to carry out the provisions of the act, the State Barber Board is vested with power to make such decisions and to exercise such discretion as is permitted by the act. The last agency is the designated "organized and representative group" which is defined in the act as follows:

Chapter 16, Section 1, Laws of Utah, 1945:

"\* \* \* (2) 'Organized and representative group' means any organization composed of duly licensed barbers collectively acting for the purpose of negotiating and fixing a scale of minimum price agreements and opening and closing days and hours representing 70 per cent or more of the licensed barbers within any city or county of the state of Utah."

In order to appreciate the manner in which the rules and regulations are adopted, so as to be binding on all barbers, it is necessary to detail the steps to be taken. Whenever 70% of the licensed barbers within a city or county agree upon a scale of minimum prices or agree upon the days or hours when the shops may remain open, an agreement is executed by the organized or representative group and submitted to the State Barber Board for approval. Within 30 days after the agreement is submitted, the Board is required to determine by investigation whether or not the suggested scale of minimum prices and the proposed days and hours of work are reasonable and are such as to enable the barber shops to operate in keeping with the purposes of the act. Within 10 days after submission of the proposed schedule of minimum prices or schedule of days and hours of work, any person may intervene and if there is a petition in intervention, a public hearing shall be held by the board. The barber board is given the power to approve the agreement and after approval to declare and

publish the prices to be charged and the hours to be worked, as set forth in the agreement. Apparently the Trade Commission of the state has neither the authority nor the power to approve or disapprove the adopted schedules. It appears to be the enforcement agency and is bound by the decisions of the State Barber Board.

Mr. Justice PRATT in his opinion has set forth some of the authorities which have passed on the constitutionality of similar statutes. While as he indicates the wording of the various statutes has brought about a lack of uniformity in the holdings, I prefer to discuss the delegation of legislative powers from two points of view other than the strict wording of the act. First, whether or not our act goes beyond the permissible limits in the delegation of legislative functions, to state agencies. Second, whether or not the act goes beyond permissible limits in the delegation of legislative functions, because it permits an administrative agency to be controlled by a representative group of a profession without adequate standards to guide either the agency or the group.

An inspection of the cases dealing with the constitutionality of barber wage and hour acts indicates that a number of them were passed during the period of the National Industrial Recovery Act, 48 Stat. 195, or shortly thereafter, and had as their purpose the prevention of what the various legislatures had determined were unfair methods of competition. I allude to this fact for the reason that two important cases by the Supreme Court of the United States [A. L. R. *Schechter Poultry Corporation* v. *United States,* 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947] involving the constitutionality of the National Industrial Recovery Act have passed on the question of delegation of legislative powers. While the holdings of that court in those cases may not be binding on this court so as to preclude us from determining the limits to which our legislature may go in delegating its legislative power, nevertheless the same principles of law involving delegation of legislative power

is involved, and the reasoning by that court is of distinct help in arriving at a proper solution of this problem.

Before quoting what I believe to be the important principles announced by the Supreme Court of the United States, I desire to point out some differences between the two acts. The National Industrial Recovery Act was passed during a period of depression when it was believed by members of Congress that some improvement in business standards was necessary to overcome the effects of a nation-wide depression. Our act was not surrounded by any such emergency. Accordingly, if we follow the reasoning of the United States Supreme Court announced in the case of *Wilson* v. *New*, 243 U. S. 332, 333, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918 A, 1024, there would be less reason for our legislature to delegate its functions in this case than there was in the N. I. R. A. cases. That court in the *Wilson* case held that while emergency does not create power, emergency may furnish the occasion for the exercise of power. If, therefore, the United States Supreme Court could not find that Congress had the right to exercise its powers on that occasion and delegate unusual authority to the President, there is less reason why we should strain to find a reason for our legislature to exercise its power and delegate unusual authority to a board when we are in a period of inflation and high prices.

Another difference between the Federal cases under the N. I. R. A. and the present one is that under the N. I. R. A. the President of the United States could upon his own initiative, investigate conditions and if he found abuses inimical to the public interest and contrary to the purposes of the act he could, after hearing and notice, present and approve a code for the particular industry. Under our act the administrative agency has no right to initiate and investigate on its own. It can merely approve, or I assume disapprove, the agreement acceptable to an organized and representative group. So that fundamentally, the right to breathe life into our law has been delegated solely to members of the industry and not to the state agency, and once

the act takes life the administrative agency is powerless to control it, the control remaining with members of the profession. This is of importance in that the delegation of power passes around the State Trade Commission and the Barbers' Board and vests the operation and control of the law in a group of individuals who are directly interested in the economical features of the act.

These differences are referred to for the purpose of illustrating that the act under attack was not conceived in an emergency that threatened the welfare of the state nor was it purposed to correct any unfair labor practices frowned on by the legislature. Rather it is an attempted delegation of powers more sweeping than those delegated under the N. I. R. A. and a delegation which permits a more arbitrary and unreasonable exercise of the powers granted without the right to correct or eliminate any announced abuses, and without any declared reason for its enactment.

Passing now to the two United States Supreme Court cases I have selected as authority for the principles governing the delegation of legislative power, in *Panama Refining Company* v. *Ryan,* 293 U. S. 388, 421, 55 S. Ct. 241, 248, 79 L. Ed. 446, Mr. Chief Justice Hughes speaking for the court said:

"* * * The Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested. Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national Legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility. But the constant recognition of the necessity and validity of such provisions and the wide range of administrative authority which has been developed by means of them cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained."

Mr. Justice Cardozo in his dissenting opinion limits his dissent from the majority opinion to the question of whether or not the Congress set up standards to control the discretion of the president. Said he at page 434 of 293 U. S. at page 254 of 55 S. Ct.:

"* * * I concede that to uphold the delegation there is need to discover in the terms of the act a standard reasonably clear whereby discretion must be governed. I deny that such a standard is lacking in respect of the prohibitions permitted by this section when the act with all its reasonable implications is considered as a whole. What the standard is becomes the pivotal inquiry."

This decision was followed in the case of A. L. A. Schechter v. United States, 295 U. S. 495, at page 529, 55 S. Ct. 837, at page 843, 79 L. Ed. 1570, 97 A. L. R. 947, and the principle was re-emphasized. Quoting from the opinion:

"Second. The question of the delegation of Legislative power. We recently had occasion to review the pertinent decisions and the general principles which govern the determination of this question. Panama Ref. Co. v. Ryan, 293 U. S. 388, [446], 55 S. Ct. 241, 79 L. Ed. 446. The Constitution provides that 'all legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.' Art. 1, § 1. And the Congress is authorized 'to make all laws which shall be necessary and proper for carrying into execution' its general powers. Art. 1, § 8, Par. 18. The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested. We have repeatedly recognized the necessity of adapting legislation to complex conditions involving a host of details with which the national Legislature cannot deal directly. We pointed out in the Panama Ref. Co. case that the Constitution has never been regarded as denying to Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. But we said that the constant recognition of the necessity and validity of such provisions, and the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained."

The principle announced by the two foregoing cases was followed by this court in the case of *Rowell* v. *State Board of Agriculture,* 98 Utah 353, 99 P. 2d 1. The following quotation is taken from the opinion at page 358 of 98 Utah at page 3 of 99 P. 2d:

"That the legislature may not surrender or delegate its legislative power is elemental.

"It may, however, provide for the execution through administrative agencies of its legislative policy, and may confer upon such administrative officers certain powers and the duty of determining the question of the existence of certain facts upon which the effect or execution of its legislative policy may be dependent. *McGrew* v. *Industrial Commission,* 96 Utah 203, 85 P. 2d 608; *Morgan* v. *United States,* 304 U. S. 1, 58 S. Ct. 773, 999, 82 L. Ed. 1129. * * *."

Mr. Justice Wolfe dissented in part from the majority opinion. However, his dissent conceded the general principles involved in delegation of powers, his point of departure was that he found certain of the standards adequately set forth.

Passing for the moment the problem of the law being brought into existence only on the demands of those interested in the profession, I desire to test the present act from the standpoint of the standards if any, set by the legislature. Under both the price-fixing provisions of the act and the days and hours provisions, the same standards are prescribed. These consist of the following:

Title 16A, Chapter 2, U. C. A. 1943, being Chapter 16, Sections 2 and 3, Laws of Utah, 1945:

"Section 2. Scale of Minimum Prices—How Fixed—Increase.

"* * * In determining reasonable minimum prices the board shall take into consideration the necessary costs incurred in the particular city and county in maintaining barber shops in a clean, healthful, and sanitary condition and also the wages and commissions which are customarily paid to employees in such barber shops and shall take into consideration any other facts and conditions affecting the barber profession in its relation to the public safety and health. If the board shall find after investigation or a public hearing that the minimum prices fixed in such districts are insufficient to provide adequate ser-

vice for protecting the public health and safety such minimum prices may be increased from time to time."

"Section 3. Power to Fix Hours of Service.

"The board shall have power to approve and by official order to establish days and hours when barber shops may remain open for business whenever agreements fixing such opening and closing days and hours have been signed and submitted to the board by any organized and representative group and the board shall have like power to conduct public hearings and to investigate the reasonableness and propriety of the hours fixed by such agreement as is conferred under Section 2 of this act."

If we first consider the "hours of service" provision of the act, we are required to determine how the standards set forth furnish a guide for a proper determination of the hours to be worked, and the days the shops are to be open. The only factors to control the board are listed in Section 2 and are these: (a) The necessary cost incurred to maintain the shop in a clean, healthful, and sanitary condition; (b) the wages and commission which are customarily paid to employees in barber shops; and (c) any other factors and conditions affecting the barber profession in its relation to the public safety and health.

Obviously Subdivisions (a) and (b) have no reasonable connection with the hours of service, so that if the legislature has erected a framework of days and hours within which the board must build, the structure must be created by Subsection (c). This subsection opens up the whole field of public safety and health and borrowing the words from Mr. Justice Cardozo's opinion in the *Schechter Poultry* case,

"The delegated power * * * is not canalyzed within banks that keep it from overflowing. It is unconfined and vagrant."

Anything the organized and representative group may recommend within the limits of public safety and health can become the law. The board is not required to approve the recommendation, but it has no power to make its own investigation to determine what might be necessary in the

interest of public safety and health, it must either accept the group's recommendation or do nothing.

To accomplish the purposes of the act, the representative group is permitted to recommend and the board permitted to determine what hours and days of opening and closing shops are inimical to the public safety and health. To reason that hours of opening and closing of barber shops have a reasonable relationship to public safety and health is to overlook the practical aspect of the problem. I suggest that the public will be just as healthy and just as safe whether a shop ones at 10 o'clock in the morning and closes at 7 o'clock in the evening as it will be if the doors are opened at 9 o'clock in the morning and closed at 6 o'clock in the evening. If hours of work have any reasonable relationship to the safety or health of the public, they could only be effectual as a health or safety measure if they limited the number of hours per day or week that the individual barber was permitted to work. He may get tired or careless if required to work excessively, but if the legislature intended to relieve the individual barber from long hours and to prescribe the working hours for them it neglected to so provide in the act. If the hours a barber shop can remain open directly affect the health and safety of the public, then it necessarily follows that the hours all stores, butcher shops, cafes, service stations, and all other establishments may remain open have the same effect. To delegate to a board the right to control all members of the business world circumscribed only by a general health and welfare clause, would be more than an unlawful delegation of powers it would be an abdication of powers by the legislature. It is impossible to find any definite standards in the act to guide the board, other than its discretion as to what is good and proper for the health and safety of the public. The legislature has not declared the general policy of the law in respect to opening and closing hours and has not set the standards which are to control and circumscribe the representative group and the Barber Board in making their decisions. On the contrary, it has delegated to both the most sweeping of

legislative powers, including the right to determine the policy and the power to establish the standards.

It would be redundant to present arguments on the right of the representative group to select the days the shops will remain closed and the rights of the Board to approve these recommendations. The same lack of standards is apparent. The legislature has declared no policy on how many days a week a barber shop shall remain open. I find nothing in the act that would prevent the board from approving agreements requiring the shops to remain open seven days a week or requiring that they close two. Even though either might be unreasonable, no guide is given the representative group or the board as to what the legislature deems reasonable or unreasonable. Each area group might recommend different days and the board would be within its power to approve all. It would thusly scatter the days of work of barber shops in different areas in the state with only its judgment of what is reasonable or unreasonable as a check on the laws it made. While it may be proper to assume the board will not act unwisely or arbitrarily, by what standard can this be determined? Certainly the legislature has not furnished any.

The standards set for prices are just as nebulous. There are no standards to guide the representative group. It can recommend any minimum price agreeable to members. In determining the reasonableness of the recommendation, the board is directed to take into consideration the costs incurred in maintaining barber shops in a clean, healthful and sanitary condition, and the wages and commissions paid to employees, but where in the act is any condition or limitation on how high the price may be set? Cannot one of the controlling factors, namely wages, be the medium by which the members of the trade can control the prices to be charged? What profit may the owner of the shop include in the price? What return on his investment shall be considered as reasonable? What items can he charge as expenses in arriving at a reasonable price? What period, if any, can be used for a cost base figure? Is the price to be

charged based on the cost of maintaining the most expensive establishment in a sanitary condition or the cost of maintaining the one-chair shop in the same condition? These questions are posed to show that the usual standards have not been proposed by the legislature and that the board has been vested with powers far in excess of that usually permitted in this type of legislation.

While many administrative agencies are permitted to set rates and prices in all instances, some measuring stick has been prescribed by the legislative body. In the federal cases under the Emergency Price Control Act, 50 U. S. C. A. Appendix, § 901 et seq., the administrator was directed to give consideration to prevailing prices during a designated base period with prescribed administrative adjustment to compensate for enumerated disturbing factors affecting prices. In the milk control acts of the various states, certain basic purposes and primary standards were set forth. Where no standards have been set other than that a board fix just and reasonable minimum wholesale and retail prices for milk, the act has been held to be insufficient in setting out standards. *Ferretti* v. *Jackson*, 88 N. H. 296, 188 A. 474. In setting up rate-fixing agencies for utilities, the purposes to be accomplished by the act and some guiding standards have been prescribed by the legislative bodies.

In the case of *Carter* v. *Carter Coal Company*, 298 U. S. 238, 56 S. Ct. 855, 80 L. Ed. 1160, the United States Supreme Court held the Bituminous Coal Conservation Act unconstitutional because of an unlawful delegation of legislative powers. One of the provisions of this act permitted the fixing of prices for coal and while the majority opinion fails to pass on the constitutionality of that particular section, Mr. Justice Cardozo treats it in his dissenting opinion. His decision is interesting in that it refers to some of the standards set forth in the act. He, however, does not mention the items that, the act prescribed, are to be considered in connection with computation of costs. Said he at 298 U. S. 332, 56 S. Ct. 882, 89 L. Ed. 1200:

"(3) Finally, and in answer to the third objection to the statute in its price-fixing provisions, there has been no excessive delegation of legislative power. The prices to be fixed by the District Boards and the commission must conform to the following standards: they must be just and equitable; they must take account of the weighted average cost of production for each minimum price area; they must not be unduly prejudicial or preferential as between districts or as between producers within a district; and they must reflect as nearly as possible the relative market value of the various kinds, qualities, and sizes of coal, at points of delivery in each common consuming market area; to the end of affording the producers in the several districts substantially the same opportunity to dispose of their coals on a competitive basis as has heretofore existed. The minimum for any district shall yield a return, per net ton, not less than the weighted average of the total costs per net ton of the tonnage of the minimum price area; the maximum for any mine, if a maximum is fixed, shall yield a return not less than cost plus a reasonable profit.  *   *   *"

Another reason affecting the validity of the act is that the legislature has also failed to furnish adequate territorial limits or guides. It has delegated to 70% of the members of the profession the right to determine whether the recommended scale shall apply only in a city or whether it shall apply to the whole country. The act provides that when 70% of the licensed barbers within any city or county agree upon a price, the same may be approved by the board. If we use Salt Lake County as an example, who determines the territorial limits? If 70% of the licensed barbers of the county reside in Salt Lake City and make recommendations for the whole of the county, they are not only permitted to set the scale of prices and hours of opening for shops in Salt Lake City, but in addition can force all other barbers in the county to comply with the requirements. They can elect to bind all or part of the county as they see fit. It appears unreasonable that the barbers operating in a metropolitan area where costs of operating a business are considerably higher and hours of opening and closing are different than in the rural areas should have the power to set the prices and determine the working hours for all operators in the county. It is no answer to say the board can determine whether or not the prices to be paid

and hours to be worked are reasonable for shops in the rural areas. The board has no discretion to set any price or schedule opening and closing hours other than that recommended by members of the profession. It can accept the territory designated by the barbers or do nothing.

Another illustration of the lack of standards in the act to govern the discretion of the administrative agency is that the Barber Board has no authority or right to lower, vary, or refix prices. It has been given no discretion to modify prices downward. Once it approves a schedule submitted by 70% of the barbers, it is powerless to act unless it can get the same percentage of barbers to petition for recission, modification or revision. Thirty-one per cent of the barbers control the operations of the remaining members of the profession, and only the repeal of the act can divest the minority of the power to regulate the business. This 31% has been delegated this power without any restraint or standards of control. The price scale or hours of opening and closing adopted by the board continue in force and effect regardless of changes in economic conditions, and unless 70% of the members of the profession agree to release the board from the approved schedules, the prices and hours are frozen. Permitting members of the barber profession to so effectively stall revision denies to the Barber Board the right to correct abuses, injustices, or mistakes, and to delegate this right is an unlawful delegation of powers. It is a complete transfer of legislative functions. If the legislature can pass to a small percentage of members of any particular business or profession the right to prevent prices from following the fluctuations of economic conditions, then it can permit a small percentage of the members of all businesses and professions to require the majority of the other members and the public generally to tread a one-way price street. To not realize that without standards to control, this way would always be up, would be for us to close our eyes to what all others are able to see.

I am of the opinion that the act is defective in that the lack of standards to control and guide the administrative agency, permits the agency to be unfettered and uncontrolled, and the sole judge of what may or may not be for the welfare of the people and the sole judge of what territory in a county shall be controlled by the profession, and therefore, the powers delegated are too broad and sweeping. This renders the act unconstitutional.

Most of the authorities passing on similar barber bills have treated the constitutionality or unconstitutionality of the act, from the standpoint of not being a proper exercise of the police power. All authorities are in agreement that the barber profession is subject to police power in the interest of public health and welfare. Our own legislature has recognized this and passed a rather comprehensive act subjecting barber shops to rules and regulations promulgated by the State Board of Health and requiring individual barbers to have certain qualifications and to have their right to practice subject to cancellation in the event they are guilty of unprofessional conduct. See Chapter 4, Title 79, U. C. A. 1943. These enactments are to protect the public from the practices that directly affect the health and welfare of the public. Certainly insofar as the public health and welfare is concerned, the legislature has enacted other measures to adequately insure sanitary condition of shops and to prevent the spread of infectious and contagious diseases.

It is most difficult to believe the intent of this act is to protect the health and welfare of the public. This has already been protected. When the mask is cast aside we see the familiar act, which is claimed to be altruistic in principle, but is nothing more than a legislative permit to increase the cost of the service to the public. It substitutes the will of the profession for the will of the legislature and stifles individual initiative and energy when it is unnecessary to do so to protect the public good. It may increase the **income of some of the individual** shop owners, but this

has no reasonable relationship to the public health and welfare.

Under certain conditions the legislature has the right to prescribe minimum wage scales and maximum working hours. Were this act sustainable under the principles enunciated in cases dealing with those subjects, the act undoubtedly would be constitutional. Here, however, we are not confronted with such an act. There are no maximum hours provided for the individual barber. The act permits a shop to remain open 24 hours a day if the board approves. Under the schedule adopted the shop is permitted to stay open 10 hours on some days and 11 hours on other days. It could not be reasonably contended the legislature intended those hours to be the maximum hours of labor for an individual barber. Under the proposed schedule, shops employing union members would be required to stagger shifts, so I can see no reason for holding that the act assures employees shorter hours. The schedule may prevent the man who works alone in his shop from working longer than between the prescribed opening and closing hours, but even for him the hours set are too long to effectively aid his health and welfare.

Similar reasoning can be directed towards the minimum wage feature. There is no minimum wage set by the act, and no prescription that the individual barber share in the increased price. If prices can be set by members of the barber profession it might be that eventually the employee will be benefited, but even so this is remote and can hardly be considered as affecting the health and welfare of the public. Insofar as the provisions of the act control the owner, he is at perfect liberty to direct the increased revenue to his own benefit. While high wages to employees may have a tendency to aid the health and welfare of the public generally, certainly low wages to the employee and high profits to the employer do not have this effect. Had the legislature intended this act to be for the benefit of the employee or for the public good, it would not have been difficult to so provide. If the act is as beneficent as claimed,

it is inconceivable that the legislature would delegate to 31% of the profession the power to defeat the laudable purposes of the law.

The Supreme Court of Arkansas in the case of *Noble* v. *Davis,* 204 Ark. 156, 161 S. W. 2d 189, 191, had this to say about a similar act: ·

"* * * The real and only purposes of the Act were to confer power on appellants to establish (1) minimum price schedules for barbers; (2) minimum commissions to be paid to barbers for their services; and (3) opening and closing hours for barber shops. Now just what connection these three purposes have with the 'protection of the public safety, health, welfare and general prosperity,' or with either of them, is difficult to perceive. How can the price a barber charges for a haircut or shave, or the commission the owner pays the barbers, or the hour the shop opens or closes affect the public safety, health, welfare or prosperity? Such connection is visionary and not real. * * *"

The Supreme Court of Tennessee in the case of *State* v. *Greeson,* 174 Tenn. 178, 124 S. W. 2d 253, 258, adopted the dissenting opinion of Chief Justice O'Niell of the Louisiana court which was filed in the rehearing of the case of *Board of Barber Examiners of Louisiana* v. *Parker,* 190 La. 214, 182 So. 485, 512. We quote the following portion of that opinion found on page 258 of 124 S. W. 2d:

" 'The only question in these cases is whether a statute authorizing a public board to fix the minimum fees that a barber may charge for his services really tends to protect the public health. It is not disputed that the barbers' trade is one which may endanger the public health, and which is therefore subject to regulation by the Legislature. But I do not see how an act of the Legislature prescribing the minimum fees,—or delegating to a public board the authority to prescribe the minimum fees,—that a barber may charge for his services can protect, or have a tendency to protect, the public health. The only appropriate way in which the Legislature can protect the public health, or promote the public welfare, in that respect, is to establish sanitary requirements and regulations, to maintain cleanliness in the barber shops, and to guard against unhealthy barbers, to prescribe qualifications and standards of efficiency, and to enforce them by means of examinations, or by requiring terms of apprenticeship. If a barber complies with all of the requirements of efficiency, and all of the

sanitary regulations, as laid down by the Board of Health or by the Board of Barber Examiners, it cannot possibly endanger the public health or the public welfare. * * *' "

The Supreme Court of Indiana in the case of *State Board of Barber Examiners* v. *Cloud*, 220 Ind. 552, 44 N. E. 2d 972, 977, arrived at the same conclusion:

"While it is conceivable that shorter hours might result in better health of the barber himself, such an end is beyond the purview of the Act. It provides for orders limiting the hours when a shop may be kept open. It does not limit the hours of labor of any barber. The particular order would permit him to work ten hours daily plus three additional hours on Saturdays and days preceding holidays. In *Patton* v. *City of Bellingham* [179 Wash. 566, 38 P. 2d 364, 98 A. L. R. 1076]; *State* v. *Paille*, Opinion of the Justices [90 N. H. 347, 9 A. 2d 663]. *State* v. *Johannes* [194 Minn. 10, 259 N. W. 537] *and Eanes* v. *City of Detroit* [279 Mich. 531, 272 N. W. 896], the courts decided that the barbers' health was not the object of legislation prescribing opening and closing hours of barber shops and with this conclusion we agree. There is nothing peculiar in the work of a barber that calls for special or class legislation to protect his health. See *Ex parte Boehme* [12 Cal. App. 2d 424, 55 P. 2d 559]. From any viewpoint therefore we are unable to see a substantial relation between the provisions of this act and the public health. The same conclusion was reached in *Knight* v. *Johns* [161 Miss. 519, 137 So. 509]; *City and County of Denver* v. *Schmid* [98 Colo. 32; 52 P. 2d 388]; *Eanes* v. *City of Detroit*, [279 Mich. 531, 272 N. W. 896]; *State* v. *Paille* [supra]; *City of Louisville* v. *Kuhn*, Opinion of the Justices [284 Ky. 684, 145 S. W. 2d 851]; *State* v. *Greeson* [supra]; *Ex parte Kazas* [22 Cal. App. 2d 161, 70 P. 2d 962]."

In *Ex parte Kazas the District Court of Appeal*, 4th District, California, 22 Cal. App. 2d 161, 70 P. 2d 962, 968, arriving at a similar conclusion, the following statement reveals:

"When we apply these descriptions of 'general welfare' to the facts of the instant case, we conclude that the legislation in question here does not fall within their terms. The ordinance does not purpose to promote the prosperity of the citizens of Bakersfield nor of any considerable class of them. It concerns itself with the welfare of a small group within a class. If we assume that there exists in Bakersfield the deplorable and chaotic condition of trade and industry which the ordinance portrays, we are confronted by the question: What specific

remedy is proposed by the ordinance? We are advised that there are forty-six barber shops in Bakersfield. The barbers and their families could not compose more than 2 per cent. of the population of the city. The ordinance is a price fixing ordinance for barbers alone. The ordinance legislates for the benefit of barbers alone. It recites that there is wide unemployment in the barbering trade. To ameliorate that condition it fixes a minimum price to be charged for haircuts and shaves. The ordinance does not purport to consider the welfare of the other 98 per cent. of the population of the city nor the effect on them of fixing the minimum prices to be charged for cutting their hair or shaving their masculine faces. We conclude that on the face of the ordinance it affirmatively appears that the legislation was not intended to promote the general welfare of the people of Bakersfield, but only a small group composing a very small proportion of the population of that city."

Other cases whose holdings are consistent with those quoted from could be referred to and others could be cited which have reached a contrary result. However, as far as I have been able to ascertain, no act which delegates so much power to members of the profession and does not permit the barber board to act independently of the representative group and revise, modify, or adopt its own prices or hours of work has yet been sustained. This peculiar provision in our act seems to me to make applicable the following language from Mr. Justice Sutherland's majority opinion in the *Carter Coal* case, found at 298 U. S. 310, 56 S. Ct. 872, 80 L. Ed. 1188:

"That subdivision delegates the power to fix maximum hours of labor to a part of the producers and the miners—namely, 'the producers of more than two-thirds of the annual national tonnage production for the preceding calendar year' and 'more than one-half of the mine workers employed'; and to producers of more than two-thirds of the district annual tonnage during the preceding calendar year and a majority of the miners, there is delegated the power to fix minimum wages for the district or group of districts. The effect, in respect of wages and hours, is to subject the dissentient minority, either of producers or miners or both to the will of the stated majority, since, by refusing to submit, the minority at once incurs the hazard of enforcement of the drastic compulsory provisions of the act to which we have referred. To 'accept,' in these circumstances is not to exercise a choice, but to surrender to force.

"The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business.  *  *  *"

For these reasons I concur in affirming the judgment.

McDONOUGH, Chief Justice (concurring).

I concur. I concur also in the result of the opinion of Mr. Justice LATIMER to the effect that the statute under consideration constitutes an unconstitutional delegation of legislative power.

WOLFE, Justice (concurring).

As I see this case there are three fundamental problems or concepts involved. Although the three are to a certain extent inextricably interwoven, clear analysis requires that, insofar as may be, they should be separated for purposes of consideration and discussion. The three concepts to which I refer, are these:

(1)   The power of the state, in the proper exercise of its police powers, to regulate the barber trade. This proposition takes on two aspects in the case at bar:
(a)   The power of the state to regulate prices.
(b)   The power of the state to regulate conditions of sanitation.
(2)   Attempt by the state to regulate conditions of sanitation by the imposition of price controls.
(3)   Exercise of police powers through delegation to an administrative board. This involves the question of definiteness of standards to which the delegatee of the regulatory powers must conform.

In this opinion, I shall attempt, insofar as possible, to keep the various concepts separate. I shall treat them in the order in which they are enumerated.

Certainly from the standpoint of health, barber shops are affected with a public interest. And if the situation arose, as in 1932, that unbridled competition was ruining all business, then all business might be affected with a public interest in that it is to the public welfare that business should not come to a standstill. And when competition sends prices down to a point where business cannot carry on, even the regulation of prices may be for the public welfare although regulation for public health reasons may not be involved, nor is the business one ordinarily considered to be affected with a public interest. In a dissenting opinion in *Rowell* v. *State Board of Agriculture*, 98 Utah 353, 365, 99 F. 2d 1, 6, I pointed out that it was held in *Nebbia* v. *People of State of New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, that

"the right of a state to fix prices did not depend on whether the business was monopolistic in nature or enjoyed a franchise from the state, nor did it depend on whether the business was affected or clothed with a public interest in the sense that its purposes were to furnish services universally used by the public such as, transportation, light, heat, water and power. The touchstone of public interest is whether the economic occasion is such as to make it desirable or necessary for the business to be regulated for the public welfare."

I then quoted from the opinion of the court as follows:

" 'But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.' "

But we are not now in such an economic situation that cut-throat competition threatens to destroy all or a large segment of business. Rather we have an inflated economy, the chief problem of which is, at present, the rapidly advancing prices of all goods and services. It is not, and it could not be successfully contended that it is necessary at this time to place a floor under the prices to be charged by barbers for the various services they render. The barber industry at this time is affected with a public interest, only

·as it relates to public health. This brings us to a consideration of the second proposition:

It appears to me that the power to regulate for health and safety of the public is here being used as a guise to permit the industry to fix its own schedule of prices and its hours of work. Of course, one may conjure up a relationship between sanitation of barber shops and income and hours of work in that a shop where the revenues are too meagre or the business day, especially in a one-chair shop, too long, may not be kept as thoroughly sanitary as a more prosperous one; but the relationship is haphazard and remote and I doubt if any such inference can be logically made. A barber, like a housewife, trained in ideas of cleanliness, will keep his shop clean despite small revenues; one not so trained may exhibit an unkempt shop despite ample revenues. And competition plays its part. People will not ordinarily patronize a dirty shop. But above all, the short and direct way to accomplish the avowed purpose of the statute would be to require by regulation certain minimum standards of cleanliness and sanitation. Tacking a price fixing scheme to a purpose of sanitation is going around Robin Hood's Barn and then not accomplishing the result desired. It would be feasible to enact direct and clear regulations regarding cleanliness and sanitation. Definite standards could have been laid down if not by the legislature at least by the Barber Board. I think the legislature might, in certain cases, leave to an industry, trade or profession the power to initiate regulatory codes for such industry, trade or profession respecting business practices, even including practices which affect competition, especially at times when dog-eat-dog competition may be destructive of all business or a large segment thereof, or lead to its centralization in monopoly or semi-monopoly ownership. But there should be some administrative body representing the public with power and duty to ascertain whether the regulations, in view of what they purpose to accomplish, are reasonably designed to that end.

I should perhaps make note of a distinction as respects the subject of regulation of rates between those industries which are subject to the free enterprise principle and public utilities. The first regulatory statutes dealing with public utility rates provided for very limited powers on the part of the regulatory bodies consequent on the filing of a schedule by the utility. I am not prepared to say that if the law under consideration were otherwise constitutional, limiting the power to mere approval or disapproval might not be valid. I prefer to place my concurrence on the bald proposition that there is no reasonable relationship between the purported police purposes of the act and the means of accomplishment. In fact, I see no exercise of the police powers.

Turning now to proposition number three, the question of standards:

In reference to the opinion of Mr. Justice LATIMER, I think I should call attention to the fact, as I did in my concurring opinion in the case of *McGrew* v. *Industrial Commission*, 96 Utah 203, 85 P. 2d 608, and in my dissenting opinion in the case of *Rowell* v. *State Department of Agriculture*, 98 Utah 353, 99 P. 2d 1, that the standards and guides required depend largely upon what is feasible to accomplish adequately the result desired by the legislature. In some cases they may be quite narrow; in other cases broad. To require rigid and minutely defined standards or guides where the matters to be regulated are of such a nature as to require flexibility, might prevent needed remedies. Otherwise, the legislature would be required to anticipate all possible situations which might arise and itself supply a rule or guide to fit each such situation, a requirement which might be palpably impossible.

Roughly, the measure of the detail content of standards or guides is what the matter or subject to be regulated will practically admit of. Otherwise, the legislature could not exercise its power to regulate what might acutely need regulation because the diversity and complexity of the regulative problems involved, would not practically admit the

setting of sufficiently detailed standards. It should be kept in mind that as a general rule the real heart of delegation is to define the area in which an administrative agent may act; the broader the field of regulation required as to a matter or subject and the greater the diversity and complexity of the problem involved in such regulation, the broader may have to be the standards.

A vulnerable feature of this legislation, constitution-wise, is that in actual effect the "organized and representative group" makes the regulation as to hours and fixes the prices on bare approval of the Barber Board *and that such remains in effect until such "group" may seek to change it.* Such machinery does not adequately or constitutionally protect the interests of the public.

Pertinent to the above, I shall call attention to the point that one of the factors named in the act for determining "reasonable minimum prices" is the "wages and commissions which are customarily paid to the employees in barber shops." Certainly in cases where the compensation of journeymen barbers is a percentage split of the charge made to the customer between such barbers and the proprietor, it would seem that up to the point where business would be materially reduced, it would be to the pecuniary interest of both barber and proprietor to "up" the minimum prices. And it would seem to make such a proposed increase by the "representative group" not so much the reason for a higher minimum scale as the consequence of it. In other words, the barbers in the "representative group" may encourage an increase in the barbers' "take" in order to enlarge the main factor which is to be taken into consideration in fixing a minimum scale.